782 So.2d 343 (2001)
Akeem MUHAMMAD, Appellant,
v.
STATE of Florida, Appellee.
No. SC90030.
Supreme Court of Florida.
January 18, 2001.
Rehearing Denied April 5, 2001.
*349 Richard L. Jorandby, Public Defender, and Gary Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Akeem Muhammad, Raiford, FL, Appellant, pro se.
Robert A. Butterworth, Attorney General, and David M. Schultz and Leslie T. Campbell, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Akeem Muhammad. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we uphold the conviction but vacate the death penalty and remand for new sentencing proceedings.
Akeem Muhammad was convicted and sentenced to death for the July 20, 1995, murder of Jimmy Lee Swanson. Swanson was at a convenience store talking on the phone with his mother when a man carrying two handguns approached and demanded, "Where is the girl?" Attempting to flee, Swanson ran toward the busy highway adjacent to the store. The man chased Swanson, while shooting both weapons. Swanson fell down in the middle of the road, and the man stood over him and fired several shots at close range. Although the fatal gunshot wounds were received at close range, several of Swanson's gunshot wounds had been inflicted from a distance. The manager of the convenience store, as well as motorists on the highway, all subsequently identified the perpetrator as Muhammad.
To explain the motive for the murder, the State presented testimony that approximately three days prior to the shooting, Sandra DeShields had stolen between $2000 and $3000 from Muhammad. After the theft, DeShields sought Swanson's help, and he provided her with a place to live for a few days. The night before the murder, DeShields overheard Muhammad threaten that he knew who had "his shit" and that he would kill DeShields and her son. Swanson drove DeShields to the bus station the night before the murder so that she could leave town. DeShields gave Swanson $300 of Muhammad's money for helping her. DeShields testified that Muhammad had seen Swanson at her house previously.
Hours after the murder, a police officer saw a rust-colored vehicle matching the description of the getaway car. Before the officers turned on the lights or sirens of the police cars, the driver of the rust-colored car stopped in a turn lane and threw his hands out the window. Muhammad told the officers that he knew he was wanted for murder. On the drive to the police station, the officer commented that he was glad that Muhammad had cooperated in the arrest and that the officers did not have to use deadly force. Muhammad responded that he wished he had provoked *350 the officers because he had nothing to live for.
The jury found Muhammad guilty of first-degree murder. During jury selection, Muhammad had discharged his penalty phase counsel because he did not want counsel to continue investigating mitigating circumstances. Before penalty phase counsel was discharged, the trial court asked what mitigating factors counsel had discussed with Muhammad. Counsel stated that Muhammad had prevented him from investigating mitigating factors. However, counsel also informed the court that he had repeatedly advised Muhammad that possible mitigating factors existed, such as age (twenty-three years old at the time of the crime), childhood abuse and neglect, living in a foster home from a young age,[1] possible mental health problems, and a heart condition.
At the close of the guilt phase, Muhammad also requested a waiver of sentencing proceedings before a jury, but the trial court denied this request. Muhammad did not present any mitigating evidence. As a result, the jury heard only the State's evidence and argument as to why the death penalty should be imposed.
The jury returned with a recommended sentence of death by a vote of ten to two. At the sentencing phase, the trial court considered mitigating circumstances contained in the presentence investigation report (PSI), which had not been presented to the jury. The trial court imposed a death sentence, finding two aggravating factors applicable: (1) previous conviction of a violent felonytwo convictions for armed robbery; and (2) the defendant knowingly created a great risk of death to many people. In mitigation, the court considered: (1) the defendant's age of twenty-three at the time of the crime (some weight); (2) the defendant's good behavior during trial (little weight); (3) the defendant's cooperation when arrested (little weight); (4) the defendant's difficult and unstable childhood (some weight). Muhammad raises sixteen points on appeal[2] *351 and seven points in his supplemental pro se brief.[3]

GUILT PHASE ISSUES
We first consider the guilt phase issues in the order in which they arose at trial.

A. Muhammad's absence from sidebar

During voir dire, the trial court had informed the jurors that if they wanted to answer any questions confidentially, the court would hold sidebar conferences with the jurors and counsel. Several potential jurors requested sidebar conferences to answer questions concerning whether their previous experiences with law enforcement officers or the court system would affect their ability to be impartial jurors. In addition, two jurors were questioned at a sidebar conference concerning whether their views on capital punishment would prevent them from following the law in making a sentencing recommendation pertaining to whether the death penalty should be imposed. Although Muhammad was in the courtroom during these sidebar conferences, he was not present at the bench. Muhammad had the opportunity to consult with his attorneys before the exercise of peremptory challenges and was present for the exercise of the challenges. At trial, no objection was raised to this procedure, but Muhammad now claims the sidebar conferences violated his constitutional right to be present at critical stages of the proceedings, which include jury selection, as well as his procedural right to be present pursuant to Florida Rule of Criminal Procedure 3.180.
Criminal defendants have a due process right to be physically present in all critical stages of trial, including the examination of prospective jurors. See Snyder v. Massachusetts, 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934), overruled in part on other grounds by Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). In Francis v. State, 413 So.2d 1175, 1178 (Fla.1982), we recognized that the process of exercising challenges to members of the jury constitutes a critical stage of the proceedings where a defendant has a right to be present. We found reversible error in Francis because the defendant did not have an opportunity to consult with his counsel while peremptory challenges were being exercised and the defendant did not subsequently waive the right to be present or ratify the procedure. See id.
During the proceedings at issue here, the jurors were being questioned concerning their ability to serve on this particular jury, for example, whether the jurors had prior experiences with the law enforcement agencies involved in this case. For that reason, we reject the State's reliance on cases stating that the questioning of jurors during the general qualifications process does not constitute a critical stage of the proceedings requiring the defendant's presence. See Wright v. State, 688 So.2d 298 (Fla.1996). We have previously explained the difference:

*352 It is important to understand the distinction between the general qualification of the jury by the court and the qualification of a jury to try a specific case. In the former, the court determines whether prospective jurors meet the statutory qualification standards or whether they will not qualify because of physical disabilities, positions they hold, or other personal reasons. The general qualification process is often conducted by one judge, who will qualify a panel for use by two, three, or more judges in multiple trials. Counsel or a defendant does not ordinarily participate in this type of qualification process, although neither is excluded from doing so.
Remeta v. State, 522 So.2d 825, 828 (Fla. 1988). Rather than involving the general qualifications of jurors, jurors were being questioned here to determine whether they were competent to serve on this particular jury. This constituted a critical stage of the proceeding and Muhammad had a right to be present.
We explained in Francis that the exercise of peremptory challenges "permits rejection [of jurors] for real or imagined partiality and is often exercised on the basis of sudden impressions and unaccountable prejudices based only on the bare looks and gestures of another or upon a juror's habits and associations." Francis, 413 So.2d at 1179.[4] As correctly observed in Matthews v. State, 687 So.2d 908, 910 (Fla. 4th DCA 1997), "[l]ogic mandates that for a defendant to intelligently participate in jury challenges, the defendant must be present for the questioning of the jurors." A defendant is entitled to more than "second hand descriptions of the prospective jurors' responses to questions during voir dire," and thus "a defendant who requests the court to permit him to participate should be allowed to obtain as much first hand information as feasible to facilitate his ability to participate in the selection of a jury." United States v. Washington, 705 F.2d 489, 497 (D.C.Cir. 1983).
In State v. Melendez, 244 So.2d 137, 139 (Fla.1971), defense counsel consented to the continued examination, challenging, and empaneling of the jury even though the defendant was physically absent from the courtroom. This Court held that no error occurs when the defendant is represented by counsel who waives the presence of the defendant and the defendant later ratifies the action of counsel. See id. at 139-40. Similarly, in Goney v. State, 691 So.2d 1133, 1135 (Fla. 5th DCA 1997), the defendant was not physically present at the sidebar conference where the questioning of jurors took place. However, the Fifth District found that the defendant had ratified the actions of counsel in selecting the jury when the trial court asked for the record whether he had talked with counsel and was satisfied with the jury.[5]See id. *353 In contrast to these cases, this Court in Francis held that fundamental error occurred when the defendant was not voluntarily absent from the proceedings where peremptory challenges were exercised, and neither knowingly and intelligently waived his right to be present, nor subsequently ratified the selection of the jury. 413 So.2d at 1178.
Unlike the defendants in both Francis and Melendez, Muhammad was in the courtroom, although not present at the bench conference where examination of the jurors was taking place. The majority of the examination took place in open court where Muhammad was present, giving Muhammad the opportunity to observe the demeanor of the jurors. Cf. Goney, 691 So.2d at 1136. Further, his defense lawyer consulted with him concerning the selection of the jurors. Most importantly, after the selections were made, Muhammad gave an affirmative answer to the trial court's question whether Muhammad had "enough time to discuss these choices with your lawyer." Accordingly, because Muhammad ratified the procedure and accepted the jury, we do not find that reversible error occurred in this case. See Melendez, 244 So.2d at 139; Goney, 691 So.2d at 1135.
In addition to the protection of the Due Process Clause, Florida Rule of Criminal Procedure 3.180(a)(4) provides that the defendant shall be present "during the examination, challenging, empaneling, and swearing of the jury." This Court interpreted rule 3.180(a)(4) in Coney v. State, 653 So.2d 1009, 1013 (Fla.1995), as requiring the defendant to be present at the immediate site where challenges are being exercised, rather than merely being present in the courtroom. Though Coney involved the exercise of peremptory challenges outside the immediate presence of the defendant, rule 3.180(a)(4) applies equally to the examination of jurors.
In Carmichael v. State, 715 So.2d 247, 248-49 (Fla.1998), this Court made clear that the Coney decision was based on our interpretation of the procedural rule rather than an absolute constitutional right to be present at the bench conference when peremptory challenges are exercised. In addition, this Court held that Coney errors must be preserved for appellate review through a specific objection.[6]See Carmichael, 715 So.2d at 249. In this case, no objection was raised and therefore the procedural protections of Coney are waived.

B. Granting of Cause Challenge Based on Juror's Views Against Death Penalty

Muhammad claims error in the trial court's granting of the State's cause challenge because of juror Ranieri's views on the death penalty. The test for determining juror competency is "whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence *354 presented and the instructions on the law given by the court." Smith v. State, 699 So.2d 629, 635 (Fla.1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1194, 140 L.Ed.2d 323, and cert. denied, 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998).
We acknowledge that this Court has found it reversible error for a trial court to excuse a juror for cause where the juror, while having reservations about the death penalty, clearly states that he or she can follow the court's instructions with regard to its imposition. See, e.g., Farina v. State, 680 So.2d 392, 396 (Fla.1996). In Farina, the juror clearly responded that she would be able to set aside her personal views on the death penalty; thus, we found the trial court abused its discretion in excusing the juror for cause. See id. In contrast, in this case we find that the trial court did not abuse its discretion in granting the State's challenge for cause. The record reveals that the prospective juror stated that she would not be able to impose the death penalty in any case besides that of a serial murderer. The juror also stated that she could not follow the law on weighing aggravating and mitigating circumstances except with serial murders. In one instance, the juror did respond that she could follow the law, but that was in response to a specific question by the defense lawyer concerning whether the fact that Florida uses the electric chair would affect her ability to follow the law.
When the juror's responses are considered together, the trial court in this case could have had a reasonable doubt as to whether this juror would be able to follow the law in imposing the death penalty. The later response concerning the electric chair did not dispel the juror's earlier equivocation concerning her ability to follow the law regarding the imposition of the death penalty. Based on the totality of the record in this case, we do not find that the trial court abused its discretion in excusing the juror for cause. See San Martin v. State, 705 So.2d 1337, 1343 (Fla. 1997), cert. denied, 525 U.S. 841, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998); Reaves v. State, 639 So.2d 1, 4 (Fla.1994); Randolph v. State, 562 So.2d 331, 337 (Fla.1990).

C. Proceeding Regarding a Witness Held Outside the Defendant's Presence

In this point on appeal, Muhammad claims that the trial court erred in conducting a hearing regarding a prospective witness out of his presence. Before giving his testimony, Aftab Katia, the manager of the convenience store, requested a meeting with the trial judge outside the presence of the defendant and jury. Without objection, the trial judge, prosecutor, and defense counsel met with Katia in chambers. These proceedings were transcribed for the record.
Katia stated that he was afraid to testify because he had received a written message warning him not to be a witness, and an unidentified person told his nephew to tell Katia "to be careful." The trial judge told Katia that "the defendant is in jail, he cannot do anything to you." The judge also stated that he understood Katia's concern, but added:
If it was that easy ... to prevent people from testifying, it would be happening all of the time[,] we would never have any trials and ... we would never have justice.... [T]he law says that if you are subpoenaed to testify and you are a witness in a case, you need to take the witness stand.
. . . .
... [I]t does not mean that I do not take [the threats] seriously, but this is a very serious case, very serious case, and what is important is that the jury knows as much as they can know about this *355 case and that is the whole purpose of the trial is to get to the truth whatever that truth is and whether the truth is that the man is guilty or the man is not guilty. That is the whole purpose of the trial and that protects us all. If you and others who are threatened do not testify, none of us would be protected and we'll have terrorists out there and eventually they will take over the states because they know that all they have to do is make a threat and they could stop everything.
The trial judge also pointed out that Katia was under subpoena and that law enforcement agencies could make arrangements to protect him and his family. The prosecutor stated that if the witness decided not to testify "the other alternative" would be jail. The trial judge responded that he hoped that would not happen because jail "is a dangerous environment ... and you will be depressed because you won't be around your family to protect them because you would be locked up. And they would be deprived of the ability to be protected." The trial judge also stated that he did not know yet whether or not Muhammad was guilty, but if he was in fact guilty and went free because Katia refused to testify:
[Y]ou might be in bigger trouble because he would be out there with you and I want you to think about that. Of course, I don't know. I don't know if he is guilty or not guilty. I don't know what the evidence is yet. I have not heard all of the evidence yet so I don't know if he is guilty or not in this case but the Law requires you as a citizen here to take the witness stand and tell the truth. You have to tell the truth and that is only the right thing to do for all of us and that is what the system obligates you to do.
Muhammad claims that the proceeding held outside of his presence violated his due process right to be present during critical stages of the criminal proceedings and his Sixth Amendment right to counsel. At the outset, the State argues that these arguments are not cognizable on appeal because the defendant did not raise a contemporaneous objection at trial. Thus, we examine this claim to determine if fundamental error occurred.
As to the merits of Muhammad's claim, we first turn to whether this proceeding outside of the defendant's presence violated his constitutional right to be present.
The constitutional right to be present is rooted to a large extent in the Confrontation Clause of the Sixth Amendment. United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). However, the right of presence is protected to some extent by the Due Process Clause where the defendant is not actually confronting witnesses or the evidence against him. Id. A defendant has a due process right to be present at any stage of the proceeding that is critical to its outcome, if his presence would contribute to the fairness of the proceedings. Kentucky v. Stincer, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); Francis v. State, 413 So.2d 1175, 1177 (Fla.1982).
Rose v. State, 617 So.2d 291, 296 (Fla. 1993).
Thus, a criminal defendant has the due process right to be present at proceedings "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by this absence, and to that extent only." United States v. Gagnon, 470 *356 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (quoting Snyder v. Massachusetts, 291 U.S. at 105-06, 54 S.Ct. 330). When a defendant is excluded from a portion of the trial proceeding without objection, the inquiry centers on whether, in light of the whole record, the fairness of the proceeding was frustrated by the defendant's absence. See Gudinas v. State, 693 So.2d 953, 962 (Fla.), cert. denied, 522 U.S. 936, 118 S.Ct. 345, 139 L.Ed.2d 267 (1997); Rose v. State, 617 So.2d 291, 296 (Fla.1993).
Federal courts have recognized that the residual powers of the courts to ensure the safety of witnesses and jurors encompasses interviewing a witness outside the defendant's presence concerning threats made by the defendant. See United States v. Adams, 785 F.2d 917, 920 (11th Cir.1986); see also LaChappelle v. Moran, 699 F.2d 560, 564 (1st Cir.1983). Although ex parte conferences should rarely be conducted, the "witness may not feel free to discuss any threats in the presence of the defendant or even counsel for defendant." Adams, 785 F.2d at 920.
We agree that under certain narrow circumstances, the independent interest of the judiciary in ensuring the integrity of trials or the safety of witnesses or jurors may justify limited proceedings held out of the presence of the defendant, as long as certain procedural safeguards are in place. In this case, the conference was not ex parte. Defense counsel was present and did not object to the procedure used by the trial court. Now, Muhammad belatedly asserts that his presence would have assisted the presentation of his defense because he could have told counsel and Katia that he had not initiated any threats.
However, during the proceedings, Katia did not discuss his substantive testimony and the trial court made no rulings. See Kentucky v. Stincer, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); Adams, 785 F.2d at 920. We find additional procedural protection from the fact that counsel was present and the proceeding was fully transcribed. See Adams, 785 F.2d at 920; LaChappelle, 699 F.2d at 567. Thus, we conclude that the absence of the defendant at this in camera proceeding did not frustrate the fairness of the trial or constitute fundamental error under these circumstances.
We turn to Muhammad's next claim that during this proceeding, the trial judge strayed from the role of impartiality and coerced a prosecution witness into giving testimony favorable to the state. In Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), the United States Supreme Court held that the defendant's right to due process had been violated when the trial judge sua sponte informed the defendant's only witness that he did not have to testify, and that if the witness lied under oath the judge would personally see that the witness was indicted for perjury.
Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the likelihood (sic) is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also *357 be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.
Webb, 409 U.S. at 95-96, 93 S.Ct. 351. The defense witness then refused to testify for any purpose. See id. at 96, 93 S.Ct. 351. The Supreme Court stated that the trial judge "did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth." Id. at 97, 93 S.Ct. 351. Instead, the "unnecessarily strong terms" used by the judge prevented the witness from freely choosing not to testify. Id. at 98, 93 S.Ct. 351.
Similarly, Florida appellate courts have recognized that reversible error may occur when a trial judge threatens a witness with perjury charges during his or her testimony when the witness indicates he or she is changing previous testimony. See Reese v. State, 382 So.2d 141, 144 (Fla. 4th DCA 1980); cf. Bell v. State, 479 So.2d 147 (Fla. 2d DCA 1985). The Fourth District in Reese concluded that while the trial judge's remarks were not as "forceful" as in Webb, the remarks, when considered together with the immediate change in testimony by the witness, constituted prejudicial error:
It is apparent that Ms. Footman believed that if she continued to testify contrary to her deposition testimony, she was going to be sent to jail. Being so convinced, she then contradicted the testimony she had given a few minutes earlier and affirmed her deposition testimony. Unfortunately, as with any witness whose memory is suddenly refreshed when confronted with the prospect of jail, one cannot be certain which version of the facts is indeed the "truth."
Reese, 382 So.2d at 144. The rationale of Reese is that if a witness is threatened with perjury charges in light of a prior inconsistent statement, the witness might be coerced to give the same testimony as that in the prior statement, not because it is the truth but because of judicial pressure from the threat of perjury charges. See id.
The context in which the comments arose distinguishes this case from both Webb and Reese. In Webb, the trial court sua sponte warned the only defense witness that he did not have to testify, and that if he did testify untruthfully, the judge would see that the witness was prosecuted for perjury. Thereafter, the witness did not testify. Similarly in Reese, threats by the trial judge to prosecute the witness for perjury occurred during the witness's testimony, which thereafter changed to conform with the prior statement, casting doubt on the ultimate reliability of the witness's trial testimony.
In contrast, in this case, the trial court's comments came in response to the witness's expressed concerns about testifying, and it was Katia who requested the meeting with the judge. The trial judge did not discuss the witness's substantive testimony. The trial judge emphasized that he did not know whether the defendant was guilty or innocent, and that he only wanted Katia to testify truthfully so that justice could be done.
Finally, Katia's testimony at trial was essentially that he saw Muhammad come into the convenience store, ask Swanson, "Where is the girl?" and follow as Swanson ran away. Katia also testified that he had *358 seen Muhammad in the store previously, though he did not know his name. Our review of the record reveals that the witness's testimony was consistent with the statements made to police prior to trial and also consistent with many other eyewitness accounts of the events. Based on the totality of the circumstances in this record, we do not find the trial court's comments amounted to fundamental error requiring reversal of the jury's verdict of guilt.
Nevertheless, although we appreciate that the trial judge here was motivated by a desire to allay the witness's fears about testifying, we caution judges who are faced with a reluctant witness to avoid comments that resort to "unnecessarily strong terms." Webb, 409 U.S. at 96, 93 S.Ct. 351. Faced with a recalcitrant witness who indicates a concern over testifying because of fear of safety or reprisal, the trial court could properly advise the witness of the legal consequences of the failure to testify. The trial court could explain that the witness is under subpoena and refusal to testify could subject the witness to being held in contempt of court, which could include the coercive sanction of incarceration. However, such reminders, if given, must be administered in a neutral and objective manner.

D. Threats to Non-Victim

In this point, Muhammad claims reversible error in the trial court's admission of the testimony of Sandra DeShields concerning prior threats made by Muhammad. DeShields testified that she had stolen approximately $3000 from Muhammad and that the day before the murder, she overheard Muhammad say that he knew who had stolen his money and was going to get it back and that he would kill DeShields and her son. Both the owner of the convenience store and Swanson's mother testified that immediately before shooting Swanson, a person ran up to him and demanded, "Where is the girl?"
The defendant's threats to a non-victim are admissible when relevant to prove a material issue, as long as the probative value of the evidence outweighs any undue prejudice. See Pittman v. State, 646 So.2d 167, 170-71 (Fla.1994). Absent an abuse of discretion, a judge's ruling on the admissibility of this type of evidence will not be overturned. See Chandler v. State, 702 So.2d 186, 195 (Fla. 1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998).
The trial court here did not abuse its discretion in ruling that the evidence of the threat was admissible to establish the motive and intent for the murder. The threat was a relevant portion of DeShields' testimony, which established that she had stolen money from Muhammad and that Muhammad knew she and Swanson were acquainted. The threat, made close in time to the actual murder, showed that Muhammad knew DeShields stole his money. The threat also demonstrated Muhammad's extreme anger over the theft and his willingness to kill in order to get his money back from DeShields. Without the complete testimony from DeShields, the jury would have been unable to fully understand the significance of Muhammad's statements immediately before the murder when he approached Swanson with two guns in hand and demanded, "Where is the girl?" Thus, the trial court did not err in finding that the probative value of this testimony outweighed undue prejudice to the defendant.

E. Statement of Future Intent or Plan

The victim's mother, Mattie Swanson, testified that she was talking on the phone with her son when she overheard a person *359 come up to him and demand, "Where is the girl?" When the State asked Mattie Swanson what she and her son had been discussing, defense counsel objected on the basis that the conversation was hearsay. The State argued that the hearsay testimony was admissible under the exception in section 90.803(3), Florida Statutes (1995), for statements of future plans or intent. The trial court overruled the objection without giving a reason for the ruling. Mattie Swanson testified that her son said he was planning to go to the courthouse to obtain a license for his carwash business. She further testified that her son "was talking to me about that car wash and getting excited and talking about his life."
We find that this evidence was not admissible under section 90.803(3)(a)2, as the State asserted in the trial court. A hearsay statement of intent or plan is only admissible under the section 90.803(3) exception when offered to "[p]rove or explain acts of subsequent conduct of the declarant." § 90.803(3)(a)2. In this case, the statement that Jimmie Swanson planned to go to the courthouse to obtain an occupational license was not offered to prove that he subsequently went to the courthouse. Thus, the statement was not admissible under this exception.
In an alternative argument, not raised in the trial court, the State supports the admission of this testimony on the grounds that it was nonhearsay because it was not offered to prove the truth of the matter asserted. Although this Court has disapproved of the tactic of arguing for the first time on appeal that evidence was admissible because it was nonhearsay, see Hayes v. State, 581 So.2d 121, 124 n. 8 (Fla.1991), the trial court's ruling on an evidentiary matter will be affirmed even if the trial court ruled for the wrong reasons, as long as the evidence or an alternative theory supports the ruling. See Caso v. State, 524 So.2d 422, 424 (Fla.1988).
The State is essentially arguing that this evidence merely provides "background facts." We have consistently disapproved the tactic of offering hearsay statements under the guise of providing a "logical sequence" of events where the contents of the statement were not relevant to establish a logical sequence of events. See Conley v. State, 620 So.2d 180, 183 (Fla. 1993); State v. Baird, 572 So.2d 904, 907-08 (Fla.1990). Although the hearsay statements did not contain the type of accusatory information condemned in Conley and Baird, given the nature of the testimony, we do not agree that the testimony provided only background facts or was necessary to establish a "logical sequence." If the statements about the victim's future plans were only "background facts," they had very little probative value. On the other hand, the testimony could have evoked sympathy in the minds of the jurors, thus running a risk that the prejudicial effect would outweigh any marginal probative value.
We conclude that although the trial court erred in overruling defense hearsay objections, the error was harmless. These statements were brief, and the prosecutor did not refer to them in later arguments. Based on our review of all the evidence in this case and the nature of the testimony erroneously admitted, we conclude that there is no reasonable possibility that the admission of these statements contributed to the guilty verdict. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).

F. Closing Arguments

Muhammad asserts that the State engaged in impermissible closing argument during the guilt phase by commenting on *360 the fear on the victim's face, mischaracterizing the detective's testimony concerning the photo lineup, and improperly arguing facts that were not in evidence. The first two comments were objected to, but the trial court overruled the defense objections. The last comment was not objected to, and thus we must examine whether it would constitute fundamental error.
The first of the arguments during the State's guilt phase final argument was made in the context of the prosecutor describing why the perceptions of the different eyewitnesses varied:
The victim of the crime ... is not here to speak because he is dead but had he survived and if he was asked to come in and tell you his perception of what happened to him and what he saw and who did it to him against the backdrop of the fear and the anger and the terror of....
This Court has found penalty phase arguments to be improper where they invited the jury to imagine the pain and suffering of the victim. See Urbin v. State, 714 So.2d 411 (Fla.1998) (imaginary script where prosecutor stated victim died pleading for his life); Garron v. State, 528 So.2d 353, 358-59 (Fla.1988) ("[Y]ou can just imagine the pain this young girl was going through as she was laying there on the ground dying.... I would hope ... that the jurors will listen to the screams and to her desires for punishment.").
The State argues that in this case, the argument that if the victim was able to testify, his perceptions of events would be "against the backdrop of the fear and the anger and the terror of" the murder is a proper comment on the evidence. A witness did testify that the victim had a look of terror on his face; however, the prosecutor's argument went beyond this and asked the jury to imagine the victim's fear, anger, and terror. The fact that the argument was made during the guilt phase does not make it exempt from our strong admonition in Garron. This argument is no less improper than the arguments condemned in Urbin and Garron, although the comments themselves were less egregious than in those cases.
Because the argument was objected to and the objection was overruled, we must determine whether the error was harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1135. In this case, the jury had already heard unobjected-to testimony from a witness as to the look of terror on the victim's face. Although the prosecutor's comments went beyond simply commenting on the evidence, based on our review of the record as a whole, we conclude that there is no reasonable possibility that this improper argument contributed the jury's guilty verdict.
Finally, the prosecutor argued to the jury that the detective who arrested the defendant had received the license plate number from a BOLO immediately before arresting Muhammad. The defendant did not object to this argument. However, the trial court had ruled this evidence inadmissible prior to trial, allowing the detective to testify only that he had received "additional information" from the dispatcher prior to making the arrest. The State had abided by the pretrial ruling and properly limited the scope of the detective's testimony during trial.
Although the State argues that this statement was a permissible comment on the evidence, we disagree. Clearly, this argument was improper in light of the trial court's prior pretrial ruling and because it was argument based on facts not in evidence. We find it difficult to understand how the interests of justice are furthered when a prosecutor runs the risk of reversal by making a clearly impermissible argument that had been the subject of a *361 specific pretrial ruling. Nevertheless, with a strong caution to prosecutors to avoid such conduct in the future, we find that this argument, to which no objection was raised, did not constitute fundamental error.[7] We further find that, in looking at the entirety of the closing argument and the nature of the remarks, the combination of both the objected-to and unobjected-to comments were harmless beyond a reasonable doubt. See Ruiz v. State, 743 So.2d 1, 7 (Fla.1999); Gore v. State, 719 So.2d 1197, 1203 (Fla.1998); Whitton v. State, 649 So.2d 861, 865 (Fla.1994).

PENALTY PHASE ISSUES
At the close of the guilt phase, Muhammad informed the trial court, after having previously discharged his penalty phase counsel, that he wanted to waive the jury proceedings during the penalty phase. Muhammad had also stated his intention not to present mitigating evidence. The State did not object to Muhammad's waiver of an advisory jury.
On appeal, Muhammad makes two related arguments that we consider together. First, Muhammad contends that the trial court abused its discretion in requiring a penalty phase jury to render an advisory sentence despite Muhammad's announced intention to waive the presentation of mitigating evidence and the penalty phase jury. Second, Muhammad asserts that this error was compounded when the trial court gave great weight to the jury's recommendation. In light of our prior case law, we do not find that the trial court abused its discretion in refusing to honor Muhammed's waiver. However, in light of Muhammed's requested waiver of both mitigation and an advisory jury and the State's lack of objection to that waiver, we find that reversible error occurred when the trial court gave great weight to the jury's recommendation in imposing the death penalty despite the fact that no mitigating evidence was presented for the jury's consideration.
We have previously held that even when a capital defendant makes a voluntary and intelligent waiver of the advisory jury's recommendation, the trial judge "may in his or her discretion either require an advisory jury recommendation, or may proceed to sentence the defendant without such advisory jury recommendation." State v. Carr, 336 So.2d 358, 359 (Fla.1976). Following Carr, we have upheld the exercise of the trial court's discretion in Sireci v. State, 587 So.2d 450 (Fla. 1991), and Thompson v. State, 389 So.2d 197, 200 (Fla.1980). Although the defendants in these previous cases did not refuse to present mitigating evidence, we do not find that factor alone sufficient to find reversible error in this case.[8]
We do find, however, that the trial court erred when it gave great weight to the jury's recommendation in light of Muhammed's *362 refusal to present mitigating evidence and the failure of the trial court to provide for an alternative means for the jury to be advised of available mitigating evidence. In determining whether the court erred in this case in giving the jury's recommendation great weight, we must consider the role of the advisory jury. Pursuant to section 921.141(2), Florida Statutes (1995), the jury's advisory sentence must be based on "[w]hether sufficient aggravating circumstances exist as enumerated in subsection (5)" and "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist." § 921.141(2)(a)-(b), Fla.Stat. (1995). "The jury's responsibility in the process is to make recommendations based on the circumstances of the offense and the character and background of the defendant." Herring v. State, 446 So.2d 1049, 1056 (Fla.1984). The failure of Muhammad to present any evidence in mitigation hindered the jury's ability to fulfill its statutory role in sentencing in any meaningful way.
In Sireci, over the State's objection, the defendant requested a waiver of an advisory jury because of his concern that, due to the time lapse between the conviction and the resentencing proceeding, the jury would necessarily know of and be prejudiced by his prior death sentence. In upholding the trial court's exercise of discretion not to waive the advisory jury, we observed:
Regardless of the jury's recommendation, the trial judge must conduct an independent review of the evidence and make his or her own findings regarding aggravating and mitigating factors. The trial judge here noted that if he found the jury was influenced by improper considerations, he had "the ability and the duty to lessen the reliance upon the jury's verdict."
Sireci, 587 So.2d at 452 (citation omitted). In other words, if the trial court denies the defendant's request to waive the advisory jury, the court not only has the ability but also the duty to lessen its reliance on the jury's verdict if other considerations make the jury's recommendation entitled to less weight. See id.
It is certainly true that we have previously stated that the jury's recommendation should be given "great weight." Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). However, this statement was made in the context of a jury's recommendation of a life sentence. This legal principle also contemplates a full adversarial hearing before the jury with the presentation of evidence of aggravating and mitigating circumstances. We have also made clear that "[n]otwithstanding the jury's recommendation, whether it be for life imprisonment or death, the judge is required to make an independent determination, based on the aggravating and mitigating factors." Grossman v. State, 525 So.2d 833, 840 (Fla.1988); see King v. State, 623 So.2d 486, 489 (Fla.1993).
In this case, although mitigating evidence may have existed, the advisory jury heard only aggravating circumstances because of Muhammad's previously stated intention not to present mitigating evidence. In fact, the trial court noted in its sentencing order that "[n]o factors in mitigation were argued to the jury." Nonetheless, the trial court afforded the jury's recommendation great weight:
The jury recommended that this Court impose the death penalty upon AKEEM MOHAMMED by a majority of 10 to 2. This Court must give great weight to the jury's sentencing recommendation. The ultimate decision as to whether the *363 death penalty should be imposed rests with the trial judge.
(Emphasis supplied.)[9] Therefore, the trial court in this case, unlike the court in Sireci, did not "lessen ... reliance upon the jury's verdict." Sireci, 587 So.2d at 452. In fact, it appears that the trial court felt obligated to give the jury's recommendation great weight.
Reversible error occurred in this case due to the trial court's decision to afford "great weight" to the jury's recommendation when that jury did not hear any evidence in mitigation and the defendant had, in fact, requested waiver of the advisory jury without objection by the State. Accordingly, we vacate the sentence of death and remand for resentencing proceedings before the trial court.
Because of the possibility that during resentencing proceedings before the trial court Muhammad will continue in his refusal to put on mitigating evidence, it is appropriate for this Court to consider what prospective procedures should apply on resentencing. It is clear from our previous cases that we expect and encourage trial courts to consider mitigating evidence, even when the defendant refuses to present mitigating evidence. We have repeatedly emphasized the duty of the trial court to consider all mitigating evidence "contained anywhere in the record, to the extent it is believable and uncontroverted." Farr v. State, 621 So.2d 1368, 1369 (Fla. 1993) ("Farr I"); see, e.g., Hauser v. State, 701 So.2d 329, 330-31 (Fla.1997); Robinson v. State, 684 So.2d 175, 176, 179 (Fla.1996). This requirement "applies with no less force when a defendant argues in favor of the death penalty, and even if the defendant asks the court not to consider mitigating evidence." Farr I 621 So.2d at 1369.
In the past, we have encouraged trial courts to order the preparation of a PSI to determine the existence of mitigating circumstances "in at least those cases in which the defendant essentially is not challenging the imposition of the death penalty." Farr v. State, 656 So.2d 448, 450 (Fla.1995) ("Farr II"); see Allen v. State, 662 So.2d 323, 330 (Fla.1995). Having continued to struggle with how to ensure reliability, fairness, and uniformity in the imposition of the death penalty in these rare cases where the defendant waives mitigation, we have now concluded that the better policy will be to require the preparation of a PSI in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence.[10] To be meaningful, the PSI should be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background. In addition, the trial court could require the State to place in *364 the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records.[11] Further, if the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion to call persons with mitigating evidence as its own witnesses. This precise procedure has been suggested by the New Jersey Supreme Court in State v. Koedatich, 112 N.J. 225, 548 A.2d 939, 992 (1988),[12] and recognized as appropriate by the Georgia Supreme Court in Morrison v. State, 258 Ga. 683, 373 S.E.2d 506, 509 (1988).[13] If the trial court prefers that counsel present mitigation rather than calling its own witnesses, the trial court possesses the discretion to appoint counsel to present the mitigation as was done in Klokoc v. State, 589 So.2d 219 (Fla.1991)[14] or to utilize standby counsel for this limited purpose.[15]
In all capital cases, this Court is constitutionally required "to engage in a *365 thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990); see, e.g., Urbin v. State, 714 So.2d 411, 416 (Fla.1998); Tillman v. State, 591 So.2d 167, 169 (Fla. 1991). This case provides a perfect example of why the defendant's failure to present mitigating evidence makes it difficult, if not impossible, for this Court to adequately compare the aggravating and mitigating circumstances in this case to those present in other death penalty cases. Muhammad was only twenty-three at the time of the crime and appears to have suffered from an extremely difficult childhood. Many years of Muhammad's early childhood were spent in foster care. Muhammad's mother had him involuntarily committed at a mental hospital and then refused to pick him up after the hospital released him. In addition, it appears that Muhammad has a history of serious psychological problems. Even though it appears from the PSI that this evidence was readily available in the form of records from hospitalizations, no evidence related to mental mitigation was presented at the penalty phase.
An adoption of a prospective procedure in this case would not call into question those cases that are already final on appeal or those cases that already have been tried but not yet decided on appeal at the time this opinion is rendered.[16] For example, we established a prospective procedure in Koon, 619 So.2d at 250, for cases in which the defendant decided to waive the presentation of mitigating evidence against the advice of counsel.[17] Because we specifically stated in Koon that this procedure would apply prospectively, we later found the procedure inapplicable to cases in which the penalty phase had been held before our opinion in Koon became final. See Allen v. State, 662 So.2d 323, 329 (Fla.1995); Elam v. State, 636 So.2d 1312, 1314 (Fla.1994).
Accordingly, we reverse for a new penalty phase proceeding before the trial court consistent with this opinion.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
HARDING, J., concurs with an opinion, in which LEWIS, J., concurs.
PARIENTE, J., concurs specially with an opinion, in which SHAW and ANSTEAD, JJ., concur.
WELLS, C.J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
HARDING, J., concurring.
I concur with the majority's decision to remand for a new sentencing proceeding *366 because the trial court erred in giving the recommendation of the jury great weight under the circumstances of this case. I also concur that requiring a presentence investigation report (PSI) when the defendant refuses to present mitigating evidence would be appropriate. However, if a trial court, pursuant to the majority's suggestion, exercises its discretion to appoint its own or standby counsel, I would restrict that counsel's presentation of evidence to matters contained in the PSI or other matters of record.
Article V, section 3(b)(1) of the Florida Constitution states in relevant part that the Supreme Court "shall hear appeals from final judgments of trial courts imposing the death penalty." Additionally, section 921.141(4), Florida Statutes (1999), states in relevant part that "[t]he judgment and conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida." Clearly, the people of this state, through the Constitution and the legislature, have expressed an intention that this Court automatically review death sentences to ensure the results reached by the trial court comport with the law. I think the requirement of a PSI in future cases where the defendant waives the presentation of mitigation is the appropriate balance between the defendant's right of self representation and the court's obligation to ensure that the death penalty is fairly, reliably, and uniformly imposed.
In Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court concluded that the Sixth Amendment of the federal constitution guarantees a competent defendant the right of self-representation. The Court examined the origins of this right and found its roots in colonial and English legal history. See id. at 829-33, 95 S.Ct. 2525. The Court found that in the history of British criminal jurisprudence, there was only one tribunal that ever adopted a practice of forcing an attorney upon an unwilling defendantthe infamous Star Chamber of the 16th and 17th centuries. See id. Of course, the Star Chamber has since been recognized as an institution which completely disregarded basic individual rights. After the Star Chamber was abolished, the trials at English common law normally consisted of an oral argument between counsel for the Crown and the defendant. See id. The right to public assistance of counsel was developed much later. Thus, during the very first trials at common law, the notion of representation at trial only consisted of self-representation. See id. When public counsel did become available, it was viewed as "a choice between representation by counsel and the traditional practice of self-representation." Id. at 825, 95 S.Ct. 2525. In fact, during this country's colonial period, "even where counsel was permitted, the general practice continued to be self-representation." Id. at 828, 95 S.Ct. 2525. "The right to counsel was clearly thought to supplement the primary right of the accused to defend himself ..." Id. at 829-30, 95 S.Ct. 2525.
Given this background, the Supreme Court made the following observations:
The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant-not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a *367 defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.
. . . .
But it is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want. The value of state-appointed counsel was not unappreciated by the Founders, yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice.
... To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."
Id. at 820-21, 833-34, 95 S.Ct. 2525 (citations omitted) (footnotes omitted).
Based on this history, it is evident that the right to self representation is well established in American jurisprudence. When a competent defendant chooses to discharge counsel, this choice must be respected. A defendant's Sixth Amendment right to self representation is not minimized or extinguished simply because it is asserted in a case in which the death penalty can be imposed.
Therefore, the majority's conclusion that a PSI be required in every case where a defendant refuses to present mitigating evidence is the best way to accomplish the goal of effective review of death sentences while at the same time respecting a defendant's right of self representation. Courts have relied on PSIs for many years in this state. By requiring trial courts to place comprehensive PSIs in the record, we can ensure that the defendant's relevant background information regarding mental health and family history will be considered by the trial court and this Court. This will further ensure that the decision as to the appropriate sentence is well informed. The majority's conclusion is bolstered by a recent report submitted to this Court from the Morris Committee.[18] In *368 that report, the Morris Committee recognized that PSIs are needed in cases where the defendant refuses to present mitigating evidence.
The majority has suggested that a trial court may exercise discretion to appoint its own counsel or standby counsel to present mitigating evidence when the defendant refuses to do so. This procedure was followed in Klokoc v. State, 589 So.2d 219 (Fla.1991), apparently without objection by the defendant or State. In Farr v. State, 621 So.2d 1368, 1371 (Fla.1993), I stated that it is "the responsibility of the trial judge to affirmatively show that all possible mitigation has been considered." However, I qualified this statement by pointing out that this Court's review is limited to the evidence that was actually presented at the trial court below. See id. ("Yet, we have no alternative under our responsibility to review the record of each case to insure that the propriety of the sentence has been established according to law.") (emphasis added). As pointed out by the majority, this Court has encouraged trial courts to order PSIs to determine the existence of mitigating circumstances. Thus, in exercising the discretion to appoint its own counsel or standby counsel, the trial court should be careful not to undermine the defendant's Sixth Amendment right to self-representation and to be the captain of his or her own ship. Likewise, the trial court should determine the basis for compensation for that counsel. While a court has a responsibility to ensure that a defendant is not using the state as a means of suicide, this responsibility does not outweigh the defendant's right of self-representation. Accordingly, if counsel must be appointed, I would limit the presentation of evidence to matters contained in the PSI and other matters of record.
LEWIS, J., concurs.
PARIENTE, J., specially concurring.
I concur in the majority's opinion that affirms the conviction and vacates the death sentence. I also applaud the significant step the majority takes to ensure uniformity in the future by requiring a presentence investigation report ("PSI") in those rare cases where a defendant waives the presentation of mitigation evidence against the advice of counsel.
I would, however, go one step further than the majority opinion by requiring the appointment of counsel to present mitigation in order to better assist the trial court and this Court in fulfilling its constitutional and statutory obligations in death penalty cases. As we have recently acknowledged, "[t]his Court has a continuing obligation to ensure the integrity of the judicial process in all cases. Our overview is especially important in death penalty cases." In re Amendment to Florida Rules of Criminal Procedure, 759 So.2d 610, 612 (Fla.1999).
Although we cannot correct the past, I am convinced that for the future we should have a uniform procedure to be followed in all cases where the defendant waives mitigation so that available mitigating evidence is placed in the record at the time of the original sentencing proceedings.[19] We should not have cases: (1) where some trial judges consider proffered evidence as *369 mitigation and others do not, see Hauser v. State, 701 So.2d 329, 330 (Fla.1997); (2) where some trial judges order PSIs in death penalty cases where mitigation has been waived and others do not, see Farr v. State, 656 So.2d 448, 450 (Fla.1995) ("Farr II"); and (3) where some judges appoint special counsel to present mitigation and others do not, see Klokoc v. State, 589 So.2d 219, 220 (Fla.1991).
This issue "involves the friction between an individual's right to control his destiny and society's duty to see that executions do not become a vehicle by which a person could commit suicide." Hamblen v. State, 527 So.2d 800, 802 (Fla.1988). We recognized in Hamblen, that "[t]his does not mean that courts of this state can administer the death penalty by default. The rights, responsibilities and procedures set forth in our constitution and statutes have not been suspended simply because the accused invites the possibility of a death sentence." Id. at 804.
When a defendant pleads guilty to murder, the inquiry of the trial court is limited to whether the plea has a factual basis and whether the plea was knowing and voluntary. See Koenig v. State, 597 So.2d 256, 257-58 (Fla.1992); Long v. State, 529 So.2d 286, 290 (Fla.1988); Muehleman v. State, 503 So.2d 310, 314 (Fla.1987). Our system allows a defendant to plead guilty to murder and a conviction properly may be based on the defendant's guilty plea.
Although the defendant may have a right to plead guilty, the defendant has no corresponding "right" after conviction to have the death penalty imposed based on a waiver of the right to present mitigation. See § 921.141(1), Fla.Stat. (2000) (providing for a penalty phase proceeding in those cases where the defendant pleaded guilty to first-degree murder). Rather, pursuant to Florida's statutory scheme, whether or not the death penalty should be imposed must be determined by an independent review of the aggravating circumstances and mitigating factors to ensure that the death penalty is fairly, reliably and uniformly imposed. In all capital cases, this Court is constitutionally required "to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990); see, e.g., Urbin v. State, 714 So.2d 411, 416 (Fla. 1998); Tillman v. State, 591 So.2d 167, 169 (Fla.1991). We cannot permit this constitutional obligation to be thwarted by the defendant's own actions or inactions.
Moreover, it is not necessarily those most deserving of the death penalty (e.g., the most aggravated and least mitigated) who seek its imposition and refuse to present mitigation. Rather, in some cases, those seeking the death penalty, while competent, may suffer from serious underlying mental illnesses. The case of Klokoc is a salient example of this fact. As we noted in Klokoc:
While this record reflects that this murder occurred when Klokoc was not in a heightened rage, it is unrefuted in this record that he was under extreme emotional distress. The record also establishes that he suffers from bipolar affective disorder, manic type with paranoid features, and that his family has a history of suicide, emotional disturbance, and alcoholism. Further, he had no record of prior criminal activity.
Klokoc, 589 So.2d at 222 (emphasis supplied). In Klokoc, although the defendant refused to put on mitigation, the Court unanimously reduced the death sentence to life based on specially appointed counsel's presentation of mitigating evidence, including evidence of mental illness.
Klokoc is also an example of the importance of a uniform procedure for evaluating *370 mitigating evidence before imposition of the death penalty in these rare cases and the benefits of appointing special counsel. In Klokoc, the trial court denied counsel's motion to withdraw "but, in view of Klokoc's lack of cooperation with his counsel, the court appointed special counsel to represent the public interest in bringing forth mitigating factors to be considered by the court in the sentencing proceeding." 589 So.2d at 220. As a result of the procedure of appointing special counsel in Klokoc to present mitigating evidence during the penalty phase, we unanimously reversed Klokoc's death sentence on the grounds that the mitigating evidence in the record rendered the death sentence disproportionate. Essentially, this reversal was over the defendant's own objection. See id. at 222.
In Klokoc, we impliedly recognized that a procedure for appointing special counsel does not conflict with the defendant's right to self-representation as set forth in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Similarly, the United States Supreme Court recently explained that "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." Martinez v. Court of Appeal of California, 528 U.S. 152, 162, 120 S.Ct. 684, 691, 145 L.Ed.2d 597 (2000). The Court concluded that the right to self-representation does not extend to an appeal because
[t]he status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when the jury returns a guilty verdict....
... [T]he autonomy interests that survive a felony conviction are less compelling than those motivating the decision in Faretta. Yet the overriding state interest in the fair and efficient administration of justice remains as strong as at the trial level. Thus, the States are clearly within their discretion to conclude that the government's interests outweigh an invasion of the appellant's interest in self-representation.
Id. at 162-63, 120 S.Ct. at 691-92 (emphasis supplied).
As with an appeal, during the penalty phase of a capital trial, the defendant has already been convicted. At this point, the State has an overriding interest in the integrity of the process by which the death penalty is imposed. As the United States Supreme Court has emphasized, the difference between the imposition of the death penalty and any other penalty gives rise to "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). We have already recognized this interest when we have required the trial court to consider any evidence of mitigation in the record, even if the defendant asks the court not to consider mitigating evidence. See Robinson v. State, 684 So.2d 175, 179 (Fla.1996); Farr v. State, 621 So.2d 1368, 1369 (Fla. 1993) ("Farr I").
Because of the tremendous responsibilities placed on the trial court and this Court in death penalty cases, rather than leave the appointment of counsel to the trial court's discretion on a case-by-case basis, I would thus adopt a prospective rule that would provide for the appointment of special counsel to present available mitigation for the benefit of the jury, the trial court and this Court in order to assist the judiciary in performing our statutory and constitutional obligations. This procedure, of course, would not prevent the defendant himself or herself from arguing in favor of the death penalty.
*371 Adoption of this procedure would serve to promote several important interests critical to the integrity of the process: (1) it would assist any advisory jury in making a more informed sentencing recommendation of either death or life and in fulfilling its statutory obligation to weigh mitigating and aggravating circumstances under section 924.141(2)(b); (2) it would assist the trial court in making a more informed decision as to whether to impose the death sentence by ensuring that the court has before it the available mitigating evidence; and (3) it would facilitate this Court's constitutionally mandated obligation to review each death sentence for proportionality.
I also believe that adoption of this procedure would serve the important additional goal of promoting finality when a sentence of death is imposed. For example, in the case of the defendant in Farr I, his repeated refusal to put on mitigating evidence has played a significant role in the multiple appeals and resentencing proceedings. See Farr v. State, 656 So.2d 448, 449-50 (Fla.1995)("Farr II"); Farr I, 621 So.2d at 1369-70. Only years after Farr's initial sentencing did he attempt to reverse his decision to waive counsel and request representation to pursue a post-conviction remedy in the trial court. See Farr v. State, 735 So.2d 1284 (Fla.1999) (table report). Because Farr's saga has not yet been completed, I can only observe that the proceedings subsequent to the initial sentencing might have been dramatically different had public counsel been appointed initially to put on mitigating evidence. Further, if there has been an assurance of an initial reliable sentencing proceeding where mitigating evidence has been presented, there should be little reason to prevent an otherwise-competent defendant from thereafter waiving post-conviction relief. Cf. Castro v. State, 744 So.2d 986, 989-90 (Fla.1999) (allowing capital defendant to waive collateral proceedings if competent to do so); Sanchez-Velasco v. State, 702 So.2d 224, 227-28 (Fla. 1997) (same); Durocher v. Singletary, 623 So.2d 482, 483 (Fla.1993) (same).
Most recently, in Hauser v. Moore, 767 So.2d 436 (Fla.2000), we learned what a difficult position this Court is placed in when a defendant refuses to put on mitigation and where no procedure exists to ensure that the trial court and this Court are appropriately informed of all pertinent and available mitigating information at the time of the initial penalty phase. Instead of an orderly procedure at the time of the penalty phase, in Hauser, we learned through verified pleadings filed in this Court only days before Hauser was scheduled to be executed that substantial mitigating evidence of Hauser's mental condition existed. Although Hauser, who had waived the presentation of mitigation, represented to the trial court during his penalty phase that he had never been treated for any mental disease, Hauser had been diagnosed, hospitalized and treated in psychiatric facilities for significant mental illnesses and had received psychiatric treatment both inpatient and outpatient. See Hauser, 767 So.2d at 437 (Shaw, J., dissenting). Apparently, this evidence was contained in readily available medical and military records.
Finally, not only would a procedure providing for appointment of special counsel promote the fair and efficient administration of justice, but it would do so without requiring significant additional resources. The additional costs of appointing special counsel would be minimal as compared to the tremendous benefits to the entire process. First, the cases where defendants waive presentation of mitigation against the advice of counsel are relatively rare. Second, defendants are already entitled to representation by counsel, and "a defendant's desires not to present mitigating *372 evidence do not terminate counsels' responsibilities" to conduct a reasonable investigation into the availability of mitigating evidence. Blanco v. Singletary, 943 F.2d 1477, 1502 (11th Cir.1991); see Thompson v. Wainwright, 787 F.2d 1447 (11th Cir.1986). Standby counsel is already routinely appointed for the defendant who decides to represent himself or herself and waive the presentation of mitigating evidence. However, appointed standby counsel does not now present mitigating evidence against the defendant's wishes; thus, counsel's presence does little to advance the fairness and reliability of the proceedings. In contrast, the addition of special counsel will assist the court in making this life or death decision rather than requiring the trial court to search out this information on its own:
[A]ll we are being asked to do is provide competent counsel during capital sentencing proceedings in all capital cases without waiver, just as we do in appellate proceedings in all capital cases without waiver. In fact, we would be imposing no additional demands on state resources, since a defendant is already entitled to such counsel, and we would be gaining enormously by ensuring the integrity of the death penalty process, an obligation that already rests upon our shoulders.
Hauser v. State, 701 So.2d 329, 333 (Fla. 1997) (Anstead, J., concurring). I agree that this is the most reasonable course for promoting fair, reliable and uniform decision-making in administering the death penalty, given this rare but difficult situation.
SHAW and ANSTEAD, JJ., concur.
WELLS, C.J., concurring in part and dissenting in part.
I concur in the result of affirming the conviction. I dissent from reversing this case and requiring a resentencing before the trial judge because I do not believe the trial judge committed error. To the contrary the trial judge followed this Court's precedent in State v. Hernandez, 645 So.2d 432, 434 (Fla.1994), Sireci v. State, 587 So.2d 450 (Fla.1991), and Tedder v. State, 322 So.2d 908, 910 (Fla.1975). The majority simply casts aside the statement in the trial judge's sentencing order in which the trial judge states:
The ultimate decision as to whether this death penalty should be imposed rests with the trial judge .... Upon carefully evaluating all of the evidence presented, it is this Court's reasoned judgment that the mitigating circumstances do not outweigh the aggravating circumstances.
I fail to understand the basis for the resentencing. Moreover, this resentencing will have to go through the cumbersome requirements which the majority now requires since Jackson v. State, 767 So.2d 1156 (Fla.2000), in such proceedings.
Of course, by reversing, the majority creates a way of applying the majority's new presentence investigation report (PSI) rule to this case. The majority's new PSI requirement may be a good approach, but I would not adopt it in this case. I think we should not adopt such procedures in cases because counsel for both the State and the defendants have had no opportunity to comment.
I also write to state my disagreement with Justice Pariente's concurring opinion as to "special counsel." First, I disagree that the procedure she advocates is not in violation of Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The procedure is certainly contrary to this Court's precedent in Hamblen v. State, 527 So.2d 800, 802 (Fla.1988). Moreover, I do not know who would pay for such "special counsel." The public is already paying for the counsel which the defendant has rejected. *373 I do not know of any constitutional obligation or any statutory authority for paying for any other counsel out of public funds. I am concerned that this procedure would have the effect of causing great confusion in the trial court as to how to proceed.
QUINCE, J., concurs.
NOTES
[1] According to a presentence investigation report ("PSI") prepared in this case, when Muhammad was fourteen years old, his mother had him involuntarily committed to a psychiatric hospital. His mother would not pick him up when he was ready to be released. Muhammad was then adjudicated dependant due to his mother's neglect, and he was admitted into foster care.
[2] Specifically, Muhammad raised the following issues in his initial brief: (1) the trial court erred in conducting a hearing respecting witness Katia out of the presence of Muhammad; (2) the court erred in allowing the hearsay testimony of Sandra DeShields as to previous threats to her and her child; (3) the court erred in overruling the defense hearsay objection to Mattie Swanson's testimony as to her son's plan to get a license for his car wash; (4) the court erred in conducting portions of the voir dire examination at the bench without the presence of appellant; (5) the court erred in granting the State's cause challenge to juror Ranieri; (6) the court erred in overruling appellant's objections and whether fundamental error occurred during the State's guilt-phase final argument; (7) the court erred in finding the "grave risk" aggravating circumstance; (8) fundamental error occurred when the state read to the jury a transcript of the taped statement of Curtis Ream during the penalty phase; (9) the court erred in failing to consider mitigating evidence present in the record; (10) this Court should recede from Hamblen v. State, 527 So.2d 800 (Fla.1988); (11) the court erred in denying the defense motion that the State disclose mitigating evidence; (12) the death penalty in this case is disproportionate; (13) the court erred in denying the waiver of jury sentencing proceedings; (14) fundamental error occurred in the State's penalty-phase argument to the jury; (15) the court erred in sua sponte instructing the jury concerning the defendant's exercise of his right of self-representation as to penalty; (16) the court employed an incorrect standard in imposing the death penalty.
[3] In his pro se supplemental initial brief, Muhammad argues that: (1) his 1991 PSI was ordered in violation of Florida Rule of Criminal Procedure 3.711; (2) section "921.231(1)(g)(I)," Florida Statutes (1995), is unconstitutional and violates Florida Statutes; (3) section "921.231(1)(A)(g)" is unconstitutionally vague; (4) Muhammad's right to privacy was violated when the State obtained his medical and family history to prepare the 1991 and 1996 PSIs; (5) the obtaining of Muhammad's Department of Health and Rehabilitative Services records and foster care records violated the law making these records confidential; (6) Muhammad's public defender may not raise issues on appeal regarding PSI reports; and (7) this Court may not consider PSI reports for the purpose of this appeal. We find these claims to be without merit.
[4] The right to exercise peremptory challenges is no longer completely unfettered. It is now recognized to be impermissible to exercise challenges on the basis of race, gender, or ethnicity. See, e.g., Abshire v. State, 642 So.2d 542, 543-44 (Fla.1994); State v. Alen, 616 So.2d 452, 454 (Fla.1993); State v. Neil, 457 So.2d 481, 486 (Fla.1984), receded from on other grounds, State v. Johans, 613 So.2d 1319, 1321 (Fla.1993). Accordingly, we recede from the language to the contrary in Francis v. State, 413 So.2d 1175, 1179 (Fla. 1982).
[5] We note that technology may allow a defendant to meaningfully participate in sidebar conferences even though the defendant is not actually physically present at the immediate site of the conference. In Goney v. State, 691 So.2d 1133, 1134-36 (Fla. 5th DCA 1997), the defendant was equipped with headphones, enabling him to hear everything that was said during the bench conference, as well as to see the reactions of the jurors. See id. The trial judge explained to the venire and to Goney that he was entitled to hear all that was said at each bench conference, and if he wanted to confer with his attorney, all he needed to do was raise his hand. See id. at 1134. In addition to finding that the defendant ratified the actions of counsel by affirmatively accepting the jury, the Fifth District concluded that the procedure used resulted in the defendant being present at the bench conference in a meaningful and realistic way. See id. at 1136.
[6] In Carmichael v. State, 715 So.2d 247, 248 n. 1 (Fla.1998), the Court also stated that Coney v. State, 653 So.2d 1009 (Fla.1995), applies to a limited window of cases where the jury was sworn in after Coney became final on April 27, 1995 and before rule 3.180 was superseded by an amendment that went into effect on January 1, 1997. The jury in this case was empaneled in 1996, within the window where Coney applies. See Carmichael, 715 So.2d at 248 n. 1.
[7] As to the second comment by the prosecutor concerning the photo lineup, we do not find that the trial court abused its discretion in overruling the defense objection. See Hawk v. State, 718 So.2d 159, 162 (Fla.1998); Esty v. State, 642 So.2d 1074 (Fla.1994); Crump v. State, 622 So.2d 963 (Fla.1993).
[8] Actually, in most of the cases in which the parties raised an issue on appeal regarding the defendant's waiver of the penalty phase jury, the trial court accepted the defendant's request to be sentenced solely by the court. See State v. Hernandez, 645 So.2d 432, 434-35 (Fla.1994); Palmes v. State, 397 So.2d 648, 656 (Fla.1981); Holmes v. State, 374 So.2d 944, 949 (Fla.1979) ("The defendant, having waived the jury cannot now complain about the failure of the trial judge to exercise his discretion to impanel a jury for the judge's benefit.") In none of the cases where the trial court refused the waiver did the defendant also refuse to present mitigating evidence.
[9] In addition, the trial judge instructed the jury that their advisory sentence as to what sentence should be imposed is entitled by Law and will be given great weight. [The] final decision as to what punishment shall be imposed rests solely with the Judge of this Court; however, the Law requires that you, the Jury, render to the Court an advisory sentence as to what punishment should be imposed on the Defendant. Your advisory sentence as to what sentence should be imposed on this Defendant is entitled by Law and will be given great weight by this Court in determining what sentence to impose in this case. It is only under rare circumstances that this Court could impose a sentence other than what you recommend.
[10] A majority of this Court has concurred that a presentence investigation report should be ordered in all capital cases just as it is a mandatory requirement in all other criminal cases. See Nelson v. State, 748 So.2d 237, 246 (Fla.1999) (Pariente, J., concurring specially).
[11] This is consistent with the prosecutors' existing obligations. Florida Rule of Professional Conduct 4-3.8(c) provides that prosecutors shall "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor."
[12] In Koedatich, the New Jersey Supreme Court actually authorized the defense attorney to present mitigating evidence against his clients's wishes. 548 A.2d at 992. The court then suggested some alternative methods that might alleviate the potential conflict of interest:

In some cases it might be desirable for counsel, in addition to presenting mitigating evidence, to inform the jury of defendant's personal position. In other cases, the court might permit the defendant himself to address the jury. Alternatively, the court could call persons with mitigating evidence as its own witnesses, or appoint new counsel to call them, and thereby place on the record the mitigating evidence essential to a careful, balanced penalty determination.
Id. at 997 (emphasis supplied) (quoting People v. Deere, 41 Cal.3d 353, 222 Cal.Rptr. 13, 710 P.2d 925, 935 (1985) (Broussard, J., concurring)).
[13] In Morrison, the Georgia Supreme Court observed:

In view of the concern for reliability inherent in our death-penalty procedures, including the automatic review by this court, the trial court in a case like this may have an obligation to conduct an independent investigation into the possible existence of evidence in mitigation. Compare People v. Deere, supra, 222 Cal.Rptr. 13, 710 P.2d at 934-35 (Broussard, J., concurring). We need not decide this question today, because the trial court here undertook to inform itself about Morrison's background and evidence in mitigation, calling as a court's witness the investigator from Tennessee, and questioning the two psychiatrists who had evaluated Morrison, especially Dr. Kuglar, whom the court questioned at length. In addition, the court reviewed Morrison's parole file, which included, among other things, the results of an earlier psychological evaluation.
Morrison, 373 S.E.2d at 509 (emphasis supplied) (citations omitted).
[14] During the trial in Klokoc, the defendant refused to allow his counsel to present mitigating evidence. 589 So.2d at 220. The trial court denied counsel's motion to withdraw "but, in view of Klokoc's lack of cooperation with his counsel, the court appointed special counsel to represent the public interest in bringing forth mitigating factors to be considered by the court in the sentencing proceedings." Klokoc, 589 So.2d at 220. As a result of the mitigation presented by special counsel, this Court reduced Klockoc's sentence of death to life.
[15] Any counsel performing this function would be acting solely as an officer of the court. Assuming that the defendant had knowingly and intelligent waived the presentation of mitigating evidence, the defendant would be barred from subsequently claiming that counsel's performance was ineffective in the presentation of mitigating evidence. See Koon v. Dugger, 619 So.2d 246, 249-50 (Fla. 1993).
[16] We have the utmost respect for the doctrine of stare decisis, which "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). However, "the role of stare decisis ... is `somewhat reduced in the case of a procedural rule which does not serve as a guide to lawful behavior.'" Hohn v. United States, 524 U.S. 236, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) (quoting United States v. Gaudin, 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)); see Payne, 501 U.S. at 828, 111 S.Ct. 2597.
[17] The prospective procedure we set forth in Koon, 619 So.2d at 250, required defense counsel to inform the trial court of what mitigation would have been presented and the defendant to confirm the waiver of the presentation of mitigating evidence on the record.
[18] The Supreme Court Committee on Post-conviction Relief in Capital Cases (the Morris Committee), was created by this Court to address the production of public records in capital postconviction proceedings. See Amendments to Fla. Rules of Crim. Pro.Rule 3.852, 723 So.2d 163 (Fla.1998). By a subsequent order, this Court reconstituted the Morris Committee and asked it to assist the Court in developing a case management plan for capital postconviction relief and to recommend amendments to Florida Rules of Criminal Procedure 3.850 and 3.851 which would improve these procedures. The Committee is chaired by Judge Stan R. Morris and is comprised of judges with capital trial experience.
[19] Without a procedure to ensure that mitigating evidence is placed in the record, the Governor's task of determining whether a death warrant should be signed in any given case is also made more difficult.