# Supreme Court of Florida

_____

No. SC12-891
_____

**DAVID KELSEY SPARRE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[January 22, 2015]

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

We reject the three claims that David Kelsey Sparre has raised in this appeal. In his first claim, Sparre argues that the trial court erred by not calling its own witnesses who potentially had knowledge of mitigating factors against the imposition of the death penalty. We determine that there is insufficient evidence in the record to support this claim. Nevertheless, we take this occasion to emphasize that when a defendant who is facing the death penalty waives the presentation of

mitigating circumstances, as Sparre has done, the trial courts shall ensure that they are considering comprehensive presentencing investigation (PSI) reports and accompanying records in accordance with the standard established in Muhammad v. State, 782 So. 2d 343 (Fla. 2001).

In his second claim, Sparre invites us to recede from our holding in Hamblen v. State, 527 So. 2d 800 (Fla. 1988). However, Sparre fails to show why the policy that we established in Hamblen is unworkable under the requirements of Florida law. Therefore, we reject Sparre's second claim and deny him any relief thereunder. In his third claim, Sparre argues that his sentence of death violates the requirements established in Ring v. Arizona, 536 U.S. 584 (2002). This claim is without merit. Therefore, we deny Sparre any relief under this claim as well.

We find there is competent, substantial evidence in the record to support the trial court's judgment that Sparre is guilty of committing first-degree murder. And, because the aggravating circumstances greatly outweighed the mitigating circumstances, the death penalty imposed on Sparre is proportionate to the circumstances established in cases where we affirmed the death penalties imposed on other defendants who were convicted for committing capital murder.

## I. BACKGROUND

Sparre was convicted for the first-degree murder of Tiara Pool. In July 2010, Tiara Pool lived in an apartment located in Jacksonville, Florida. During

that month, her husband Michael Pool, a sailor in the United States Navy, was at sea aboard a naval ship. The Pools' two young sons were in Bonifay, Florida, living with their paternal grandmother. Michael Pool later testified that he and Pool had had some marital problems, and that he had some suspicions that Pool had been involved with other men. Michael Pool testified that he never met Sparre.

On July 1, 2010, Pool posted an ad on Craigslist in which she indicated that she wanted to meet a white male that met certain criteria that she outlined. However, nothing about Pool's Craigslist posting was sexually suggestive. On July 5, Sparre initially responded to Pool's Craigslist posting. From Sparre's initial contact with Pool until July 8, Sparre and Pool spoke to each other multiple times by phone and exchanged numerous text messages; some of the text messages Sparre and Pool exchanged contained sexually explicit content.

On July 12, Nichelle Edwards, a friend of Pool's and her part-time sitter, went to Pool's apartment to check on her because Pool had been incommunicado for several days. Edwards entered the apartment using a key that Pool had previously given her. When Edwards went to the master bedroom and slightly opened the door, she saw a hand on the floor. Edwards immediately ran out of the apartment and dialed 911.

Officer Wesley Brown of the Jacksonville Sheriff's Office (JSO) was the first responder on the scene. Officer Brown went into the apartment and found Pool's bloody, nude body on the master bedroom floor. A short time later, Detective Deborah Brookins and other crime scene investigators arrived to relieve Officer Brown and to begin their work of processing the murder scene.

The crime scene investigators found no indications of forced entry into Pool's apartment. However, they found Pool's open, rummaged-through purse on a table in the living room, and her cellular phone placed on the back of the sofa. In the master bedroom, there was blood around Pool's body—on the carpet, baseboards, door, and wall. Investigators also found a blue towel under Pool's body. On the bed, there was blood, various articles of clothing, and a bottle of Oxi-Clean. There was blood on the master bathroom door, and blood droplets at the entrance to the bathroom. There was blood in the grout on the floor near the tub and the toilet. A large knife, matching those in a knife block set in Pool's kitchen, was resting against the side of the bath tub. The knife's tip was broken off, and the blade was bowed. This knife was later established as the murder weapon.

Dr. Jesse Giles, a medical examiner, opined that Pool was alive and conscious through at least eighty-eight sharp-force injuries, which included thirty-

nine defensive wounds.[1]  Investigators testified that the crime scene was "cleaned" to such an extent that virtually no evidence of Pool's assailant was recoverable. However, investigators found a mixture of DNA material on the murder weapon. Jason Hitt, a Florida Department of Law Enforcement biological/DNA analyst, testified that when he tested the mixture of DNA material recovered at the murder scene he was able to rule out ninety-nine percent of the world's population; yet, Sparre and Pool were possible contributors to the mixture of DNA material found on the murder weapon.  In addition, Kevin Noppinger, a former DNA analyst, testified that he found Y-DNA material taken from the murder weapon's handle matched Sparre's.

Investigators found that the following items of Pool's were missing: her 2003 Chevrolet Malibu, a PlayStation 3 game console, a DVD, and a wireless modem.  During a routine patrol on July 14, JSO Officer Christine Upton located Pool's automobile parked one block north of St. Vincent's Hospital.

Because he was a person of interest in the case, also on July 14, JSO Detectives Patrick Bodine and James Childers traveled to Brantley County, Georgia, where Sparre resided.  Deputy John Simpson, a Brantley County Sheriff's

---

1. The following are among the most remarkable injuries that Pool suffered: (1) two single deep stab wounds that penetrated each of the lungs (both potentially fatal wounds); (2) a deep slash to her throat and neck (a potentially fatal wound); and (3) a deep stab wound to her skull in which the broken knife tip was found.

Office investigator, accompanied the JSO detectives to Sparre's residence. Sparre consented to being interviewed and accompanied the JSO detectives to the local sheriff's office. Deputy Simpson actually transported Sparre to and from the local sheriff's office where Sparre's interview took place on July 14.

JSO detectives video-recorded their interview with Sparre at the sheriff's office in Brantley County. Sparre informed the detectives that he met Pool after he responded to an ad that Pool had posted on Craigslist.

In his initial interview with the detectives, Sparre represented that he and Pool agreed to meet at St. Vincent's Hospital in Jacksonville on July 8. According to Sparre, after meeting Pool, she drove him to her apartment where they engaged in consensual sexual relations. Sparre alleged that Pool drove him back to the same hospital a few hours later, left him near the main entrance, and drove away.

Later, due to inconsistencies in Sparre's account of his July 8 encounter with Pool, and other evidence uncovered during their investigation, Sparre became the detectives' prime suspect in Pool's murder. One of the discrepancies the detectives found was Sparre's false statements about the location from which he sent two text messages to Pool's phone on the evening of July 8. Karen Mildrodt of Verizon Wireless later provided testimony about the activity on Sparre's phone based on the location of cellular phone towers on July 8. The investigating detectives had

utilized location information about his phone activity to determine that Sparre had not been completely truthful about the timing of his whereabouts on July 8.

On July 23, Detectives Bodine and Childers obtained a warrant for Sparre's arrest. The detectives learned that sometime after meeting with them on July 14, Sparre left Brantley County, Georgia, and relocated to Charleston, South Carolina. Therefore, on July 24, Detectives Bodine and Childers traveled to Charleston to arrest Sparre and interview him there. Sparre's interview on July 24 was also video-recorded. The jury later viewed a version of Sparre's July 24 interview with JSO detectives, portions of which the trial judge ordered to be redacted in accordance with mutual consent of the parties. The video-recording shows that after he gave the detectives various versions of his encounter with Pool, Sparre ultimately admitted that he murdered her with the kitchen knife investigators found at the murder scene.

Sparre also told the detectives that he remembered everything that he touched in Pool's apartment. Sparre boasted to the detectives that he painstakingly wiped down, with his socks, every area or item that he contacted in Pool's apartment. Sparre also stated that he wiped his fingerprints from Pool's car in the same manner. Richard Kocik, a JSO latent fingerprint examiner, later testified that he did not detect any of Sparre's fingerprints at the murder scene, or in and on Pool's car. And when the detectives asked Sparre where he learned how to "clean"

a crime scene, Sparre stated that he learned by watching the television program CSI: Crime Scene Investigation.

## II. PROCEDURAL HISTORY

A grand jury indicted Sparre for one count of first-degree murder that occurred in Duval County sometime on or between July 8, 2010, and July 12, 2010. The State gave notice of its intent to seek the death penalty pursuant to Florida Rule of Criminal Procedure 3.202. Sparre was represented by the Office of the Public Defender.

## III. GUILT PHASE

The guilt phase of Sparre's trial was conducted from November 28, 2011, through December 2, 2011. Following jury selection, the prosecution presented its opening statements. However, prior to defense counsel's opening statement, and when the jury was excused, defense counsel informed the trial court that Sparre agreed with the defense strategy to argue he committed second-degree murder. The trial judge conducted a colloquy to confirm whether Sparre knowingly and voluntarily agreed to the strategy defense counsel announced. When the proceedings resumed, defense counsel conceded in the opening statement that Sparre committed second-degree murder, not first-degree murder.

Notwithstanding defense counsel's admission that Sparre was Pool's murderer, during its case-in-chief, the State presented fourteen witnesses.[2]

A key witness for the State was Sparre's former girlfriend Ashley Chewning. Chewning testified that prior to his arrest Sparre had confessed to her that he had killed a black woman in the victim's Jacksonville apartment. Chewning testified that she did not initially believe Sparre's confession, but she remembered asking him about a PlayStation 3 game console that he had at the time. According to Chewning, Sparre told her that "he stole it from the woman he killed."

After the State rested, defense counsel moved for a judgment of acquittal as to premeditation and felony murder. The trial court denied the motion. Defense counsel then informed the trial court that Sparre would not present a defense. The trial court conducted a colloquy with Sparre to confirm whether his decision to forego putting on a defense, including the exercise of his right as the defendant to testify in his own behalf, was a knowing and voluntary one. Following the trial court's colloquy with Sparre, defense counsel renewed the motion for judgment of

---

2. The State's witnesses were: Nichelle Edwards, Officer Wesley Brown, Detective Deborah Brookins, Michael Pool, Detective Patrick Bodine, Karen Mildrodt, Detective James Childers, Officer Christie Upton, Richard Kocik, Jason Hitt, Kevin Noppinger, John Simpson, Ashley Chewning, and Dr. Jesse Giles.

acquittal without providing any additional argument. The trial court denied the renewed motion.

The prosecutor and defense counsel presented closing arguments. The defense argued that Sparre had no prior plan to murder Pool, and that the killing was a second-degree murder.

After the closing arguments concluded, the trial court instructed the jury on: (1) first-degree premeditated murder; and (2) first-degree felony murder with burglary as the underlying felony. The trial court instructed the jury on the lesser included offenses of second-degree murder and manslaughter.

The jury retired to deliberate from 9:42 a.m. to 10:16 a.m. The jury convicted Sparre by special verdict for both premeditated murder and felony murder with both burglary and that Sparre carried, displayed, used, threatened to use, or attempted to use a weapon as the underlying felonies.

## IV. PENALTY PHASE

On December 13, 2011, the trial court conducted the penalty phase. Before the jury was called, defense counsel alerted the trial court that although the defense team was poised to present several witnesses with knowledge of mitigation evidence, Sparre informed them that he did not want any mitigation case presented. Defense counsel assured the trial court that there was substantial mitigation they were prepared to present including mental health mitigation which the defense

- 10 -

uncovered through the work of two mitigation specialists, David Douglas and Dan Roberts, who traveled to Georgia to investigate the proffered mitigation.[3]

The trial court conducted a Koon[4] inquiry with Sparre to confirm whether his waiver of putting on the mitigation evidence proffered by his defense team was knowing and voluntary.[5] Defense counsel also informed the trial court that it did not believe Sparre was incompetent, but that he simply rejected the advice of counsel to put on the mitigation case his defense team had investigated and prepared for presentation to the jury. The trial court found Sparre's waiver of his

_____

3. In summary, Sparre's defense team proffered that it was prepared to present the following mitigation evidence: (1) Sparre has no significant criminal history as mitigation; (2) four mental health experts that would testify as to mental health mitigation; (3) Dr. Harry Krop was prepared to testify that Sparre had five diagnoses of ADHD, posttraumatic stress disorder (PSTD), substance abuse, intermittent explosive disorder, and bipolar schiziod-affective disorder; (4) Dr. Buffington was prepared to testify that Sparre's continued use of hydrocodone, possibly powder cocaine, alcohol, and other drugs could cause blackouts, and memory loss; (5) both Dr. Alligood and Dr. Greenberg were prepared to testify regarding Sparre's PTSD dating from the time he was in the Tara Hall School for Boys in South Carolina when he was 11, 12, or 13 years old; (6) Shannon Bullock, a missionary and counselor at Tara Hall would testify as to Sparre's dysfunctional family, his mother's neglect of him, and Sparre's belief in God; (7) several of Sparre's family members were prepared to testify about his dysfunctional family background and personal history; and (8) James Dunn, the director of Tara Hall, would testify as to the little family contact Sparre had while he was at the school.

4. See Koon v. Dugger, 619 So. 2d 246 (Fla. 1993).

5. The trial judge conducted the same colloquy with Sparre at the conclusion of the State's case in the penalty phase about his declination to put on the proffered mitigation evidence.

right to present mitigation to be knowingly and voluntarily entered. The trial court also found Sparre lucid during its inquiry with him.

Prompted by an objection made by the defense, the State informed the trial court that it was withdrawing its previous request that the trial court instruct the jury on the pecuniary gain and the CCP aggravators. The State presented Michael Pool, Thelma Summers (Michael Pool's grandmother), and Valerie Speed (Pool's aunt) as witnesses with victim impact statements. These witnesses simply read prepared statements to the jury, without examination by the lawyers. Afterward, the State rested.

Following its consultation with Sparre, the defense withdrew its request that the trial court instruct the jury on the statutory mitigating circumstance that Sparre had no significant criminal history mitigator as a matter of law because the State was prepared to introduce rebuttal evidence that Sparre committed domestic violence against his former girlfriend. Prior to the defense's decision to withdraw its request for the instruction on no significant criminal history, the trial court ruled that if defense counsel introduced evidence regarding the no significant criminal history mitigator, it would allow the prosecutor to introduce evidence that Sparre had a history of intentionally hurting animals to relieve stress.[6] Under oath, Sparre

_____

6. The State was prepared to present evidence that Sparre made admissions to Dr. Krop about deliberately killing animals—Sparre shot dogs with firearms, and he once ran over a cat with a lawnmower.

- 12 -

testified before the trial judge that he agreed with defense counsel's withdrawal of its previous request for a jury instruction on the no significant criminal history mitigating factor.

Ultimately, the trial court instructed the jury on two aggravating circumstances of felony murder and that the murder was heinous, atrocious, or cruel (HAC).  It also instructed the jury on the extreme mental or emotional disturbance statutory mitigator and the age statutory mitigator.  The trial court also instructed the jury on the general catch-all mitigation of "any other factors in the defendant's character, background or life."  The trial court also gave the jury special instructions on seventeen nonstatutory mitigators.

The jury retired to deliberate.  However, less than an hour later, the jury posed a question to the trial court regarding the meaning of the eighth nonstatutory mitigating factor—the incident was situational.  The Defense objected to the trial court providing any further definition to the jury.  The State also objected for the same reason.  The trial court responded to the jury in the presence of Sparre and counsel as follows:

> Ladies and gentlemen, I don't have any additional definitions for you as to that.  I'm just going to ask you to rely on your common sense and the instructions as I have already given them to you and ask you to continue to deliberate on your recommendation, okay?  Thank you.

The jury resumed its deliberations from 3:05 to 3:27 p.m. Afterward, by a twelve-to-zero vote, the jury recommended that the trial court impose the death sentence.

The trial court ordered a PSI report. The trial court also requested sentencing memoranda from the parties. The trial court informed Sparre that he had a right to present mitigation evidence during the prospective Spencer[7] hearing.

## V. SPENCER HEARING

On January 27, 2012, the trial court conducted a Spencer hearing. At the start of the Spencer hearing, defense counsel informed the trial court that Sparre maintained his refusal to allow his defense team to present mitigation. Defense counsel proffered to the trial court that mitigation evidence would have been presented through twenty-five witnesses. Moreover, counsel represented that it was the same mitigation evidence the defense team would have presented at the penalty phase, except that one additional witness would have appeared during the Spencer hearing. The trial court conducted another colloquy with Sparre to confirm whether his waiver of mitigation was knowing and voluntary.

The trial judge inquired whether the parties had any arguments pertaining to the filed PSI report. Defense counsel raised no objections to the trial court about the PSI report as filed. The State, however, initially sought to correct Sparre's

7. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

military background contained in the PSI report to include a fight, but later the State conceded that Sparre's Chapter 11 administrative discharge from the Army noted in the PSI report sufficed for its concerns. The Chapter 11 administrative discharge that Sparre received indicated that he had problems adjusting from civilian life to military life. Prompted by a concern raised by the State, the trial court stated for the record that it had no intention of considering the sentencing recommendation made by the parole officer who prepared the PSI report.

The State presented the testimony of JSO Officer Daisy Peoples and Chewning for purposes of identifying a letter Sparre attempted to mail to Chewning. The letter, dated January 2, 2012, was retrieved by correctional staff and not mailed. We note that the trial judge ordered that the letter be sealed, and neither witness was permitted to read from or disclose on the record any of the contents of the letter.[8] The trial court overruled defense counsel's objection to this additional testimonial evidence on the basis that it was offered to reinforce aggravation already proven.

The State presented Officer Peoples because her job was to monitor letters sent out or received by inmates. Officer Peoples testified that she retrieved from

---

8. We note that the unsworn contents of Sparre's letter dated January 2, 2012, describes his assertion that he deliberately planned Pool's murder several days beforehand. Therein, Sparre alleged that he intended to carry out the murder by stabbing or other sharp force trauma.

- 15 -

Sparre the letter dated January 2, 2012, when he was housed in a one-man holding cell. Therefore, Officer Peoples testified that she was certain that she retrieved the letter at issue from Sparre. Chewning testified during direct examination that she recognized the handwriting in the letter as Sparre's handwriting. The defense did not cross-examine Chewning.

Following the testimony, defense counsel moved for a new trial. The trial court denied the defense's motion for a new trial. Defense counsel also unsuccessfully moved the trial court for a new penalty phase.

The trial court conducted a colloquy with Sparre to confirm whether his declination to exercise his right as the defendant to testify at the Spencer hearing was knowing and voluntary. The State advised the trial court that it was prohibited from giving the jury's recommendation to impose the sentence of death great weight because the defense chose not to present any mitigation during the penalty phase. The State further argued that two aggravators were proven: (1) the felony murder aggravator; and (2) HAC. The State argued that the trial court should give these aggravators great weight. The State discussed the following mitigating circumstances: (1) it argued against the extreme mental or emotional disturbance mitigator; (2) it acknowledged that the statutory age mitigator applied, but urged the trial court to give it little weight because even though Sparre was nineteen

years old, he was not an inexperienced young man; and (3) it discussed the nonstatutory mitigators, urging the court to give them little weight.

After the Spencer hearing, both parties filed respective memoranda addressing whether the death penalty should be imposed. And, on February 9, 2012, the trial court entered an order admitting into evidence Sparre's letter dated January 2, 2012.

## VI. SENTENCING

On March 30, 2012, the trial court conducted the sentencing hearing. After hearing from the lawyers, the trial court read into the record a substantial portion of its previously prepared, written sentencing order. The trial court noted that it ordered a PSI report and that "this Court has carefully considered the entire record including the PSI in evaluating mitigating circumstances." The trial court found two aggravating circumstances to which both were assigned great weight: (1) HAC; and (2) the murder was committed during the course of a burglary.

The trial court found a single statutory mitigating circumstance—Sparre was nineteen years old at the time of the murder—to which it assigned moderate weight. The trial court explained its weighing decision regarding the age mitigating circumstance, noting that to be significantly mitigating, age must be "linked with some other characteristic" such as immaturity, but the trial court found "no evidence of significant emotional immaturity." The trial court noted

that Sparre "had received his GED; had served in the Army National Guard for a year; and was a father." The trial court also stated that it considered the totality of circumstances in the case. However, it ultimately rejected the statutory mitigating circumstance of extreme mental or emotional disturbance based on the following rationale.

Despite defense counsel's proffer that mental health experts could establish that Sparre suffered from PTSD, Sparre's efforts to conceal his involvement, including cleaning up the crime scene and attempting to establish an alibi by sending a text to the victim after she was dead, negated the likelihood that Sparre was under extreme mental or emotional disturbance at the time of the murder. The trial court also observed that the defendant wrote in a letter to his ex-girlfriend that he wanted to murder someone just to see how it felt, all of which negated any claim of extreme emotional disturbance. Based on the evidence in the record and the PSI report, the trial court found thirteen nonstatutory mitigating factors and assigned each of them weights.[9]

_____

9. Nonstatutory mitigators found were: (1) Sparre accepts responsibility for his actions (little weight); (2) Sparre has been neglected (some weight); (3) Sparre suffers from emotional deprivation and was emotionally abused (some weight); (4) Sparre was physically abused by his step-father and mother (some weight); (5) Sparre lacks a good support system (some weight); (6) Sparre's father was absent from his life (some weight); (7) Sparre is good at fixing things (slight weight); (8) Sparre dropped out of high school but obtained a GED (little weight); (9) Sparre participated in ROTC in high school and was in the U.S. military (slight weight); (10) Sparre is devoted to his grandmother (little weight); (11) Sparre has a child

In its final analysis, the trial court concluded that based on the "heinous nature of Tiara Pool's murder," the "aggravating circumstances in this case far outweigh the mitigating circumstances" and the scales "tilt unquestionably to the side of death." The trial court explained that it was not giving the jury recommendation great weight because the defendant waived presentation of mitigation. The trial court sentenced Sparre to death.

## VII.  ANALYSIS

### A.  <u>Muhammad</u> Claim

Sparre argues that the trial court abused its discretion by not calling the proffered witnesses as its own after the defense team informed the trial court that Sparre forbade it from putting on a mitigation case. The State argues that Sparre cannot waive the presentation of mitigation evidence during the trial, and then raise the claim during his direct appeal that the trial court abused its discretion by not calling its own witnesses that had knowledge of mitigation. For the reasons discussed below, we conclude there is insufficient evidence in the record to support Sparre's assertion that the trial court abused its discretion by violating our holding in <u>Muhammad</u>, 782 So. 2d at 343.

### 1.  Standard of Review

---

(some weight); (12) Sparre loves his family (some weight); and (13) Sparre's family loves him (some weight).

When a capital murder defendant waives his or her right to present a mitigation case, if the trial court is alerted to the probability of significant mitigation, the court has discretion to call its own witnesses or to appoint special counsel for purposes of introducing such evidence. Muhammad, 782 So. 2d at 364. A trial court's " '[d]iscretion is abused only "when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court." Ocha v. State, 826 So. 2d 956, 963 (Fla. 2002) (quoting Trease v. State, 768 So. 2d 1050, 1053 n.2 (Fla. 2000) (quoting Huff v. State, 569 So. 2d 1247, 1249 (Fla. 1990))).' " This Court will only disturb the trial court's discretionary judgment when the record shows that the judgment was an abuse of discretion.

### 2. Merits

Sparre asserts that the trial court abused its discretion by not calling its own witnesses from a list of twenty-five people, including four clinicians, that defense counsel proffered would provide substantial mental mitigation evidence. In Muhammad, this Court established the existing policy requiring preparation of a comprehensive PSI report when a capital murder defendant waives the presentation of mitigation evidence.

> [W]e have now concluded that the better policy will be to require the preparation of a PSI in every case where the defendant is not

challenging the imposition of the death penalty and refuses to present mitigation evidence. To be meaningful, the PSI should be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background. In addition, the trial court could require the State to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records. Further, if the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion to call persons with mitigating evidence as its own witnesses. . . . If the trial court prefers that counsel present mitigation rather than calling its own witnesses, the trial court possesses the discretion to appoint counsel to present the mitigation as was done in Klokoc v. State, 589 So. 2d 219 (Fla. 1991) or to utilize standby counsel for this limited purpose.

Muhammad, 782 So. 2d at 363-64 (footnotes omitted).

For more than a decade, we have upheld the Muhammad policy, which requires that comprehensive PSI reports be prepared and filed with the trial court whenever a capital defendant facing the death penalty waives his or her right to present a mitigation case. See, e.g., Russ v. State, 73 So. 3d 178 (Fla. 2011) (discussing Muhammad requirements); McCray v. State, 71 So. 3d 848, 879-80 (Fla. 2011) (citing Muhammad, 782 So. 2d at 363).

Here, we reemphasize that the trial courts should take the necessary steps to ensure that the PSI reports that they order are indeed prepared in a comprehensive manner. Muhammad, 782 So. 2d at 363. To that end, we emphasize that the record on appeal must be comprised of PSI reports that are meaningful in

- 21 -

circumstances in which a competent defendant knowingly and voluntarily waives the presentation of mitigation evidence.

We think it is prudent that trial court orders contain language that does not leave to chance that PSI reports, prepared by non-lawyers, will satisfy the Muhammad standard. Rather, such orders should specify the kind of information the trial judge needs to consider. Trial court orders that provide sufficient guidance for the preparers of PSI reports will invariably operate to ensure that in every case the PSI reports will provide the trial courts with meaningful information about the defendant's background and personal history. In Muhammad, we contemplated that comprehensive PSI reports and their accompanying records would put the trial court on notice about any potentially significant mitigation that exists.

Sparre now claims that he is entitled to relief because the trial court violated the Muhammad standard because without hearing testimony from the proffered witnesses, the guilt phase evidence and the PSI provided the only basis for finding the mitigating circumstances against imposing the death penalty. The PSI report addressed Sparre's physical and mental health as follows:

> When interviewed at the Pre-Trial Detention Facility on December 28, 2011, the defendant stated he was in good physical health and denied being depressed or suicidal. The defendant showed no obvious signs of impairment to this officer. The defendant's grandmother disagreed with the defendant's self-assessment. She stated the defendant was

"mentally challenged and had mental problems," in addition to suffering from ADHD.

And, regarding Sparre's alcohol and drug abuse, the PSI report stated:

> The defendant admits to both heavy drinking and extensive drug use since an early age. The defendant states he has been using pills since age 14. He stated he had illegally used Xanax, Ecstasy, Hydrocodone and Percocet pills. He stated his drug of choice is alcohol. He admits that he preferred vodka, and was a blackout type of drinker, on average blacking out two times per month. He stated he was normally non-violent and laid back under the influence of alcohol. He stated he did not prefer bourbon, because he did not like the effect as it was the opposite of feeling laid back. He admitted he blacked out on his 18th birthday when drinking and partying with his mother.

We observe that neither party raised any objection on the record or otherwise informed the trial court that the PSI report filed is inadequate under Muhammad or any other legal standard. Accordingly, under the totality of the circumstances present in Sparre's case, we are unpersuaded that the PSI report the trial court considered lacked meaningfulness to the point of violating the Muhammad standard that it be a comprehensive document. Id.

Moreover, there is insufficient information in the record showing that the trial judge's declination to call any witnesses alleged to have knowledge of mitigation evidence pertaining to Sparre's sentence reflects a departure from the Muhammad standard. In its sentencing order, the trial court entered findings from which it concluded that Sparre was not under the influence of extreme mental or emotional disturbance. The trial court addressed evidence that Sparre had planned

- 23 -

the crime several days before meeting Pool in Jacksonville. Next, the trial court addressed Sparre's numerous actions to conceal his involvement after he murdered Tiara Pool.[10]

The record also reflects that the trial court properly found that Sparre's age of nineteen years at the time of the crime was established under the statutory requirements. See § 921.141(6)(g), Fla. Stat. (2010). And, the trial court's discretionary judgment to assign this statutory mitigating factor moderate weight in Sparre's case is supported by existing case law. See Spann v. State, 857 So. 2d 845, 859 (Fla. 2003) ("[T]he weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard."); see also Caballero v. State, 851 So. 2d 655, 661 (Fla. 2003) ("The determination of whether age is a mitigating factor depends on the circumstances of each case, and is within the trial court's discretion."); Hurst v. State, 819 So. 2d 689, 697-98 (Fla. 2002) ("[W]here the defendant is not a minor, i.e., under eighteen, 'no per se rule exists which pinpoints a particular age as an automatic circumstance in mitigation. Instead, the trial judge is to evaluate the defendant's age based on the evidence

---

10. The record shows the following evidence in support of the trial court's judgment: (1) Sparre cleaned the murder scene and bragged to detectives about doing so; (2) Sparre tried to establish an alibi by sending a text to Tiara Pool; (3) Sparre parked Tiara Pool's car away from the hospital and its surveillance cameras; (4) Sparre burned the clothes he wore on the day of the murder; and (5) Sparre made statements in a letter dated September 16, 2011, stating "I slumped [i.e., killed] that b[*]tch."

adduced at trial and at the sentencing hearing.' " (quoting Shellito v. State, 701 So. 2d 837, 843 (Fla. 1997))).

Furthermore, we determine that there is competent, substantial evidence in this record for the thirteen nonstatutory mitigating factors for which the trial court assigned some, little, and slight weights. See Spann, 857 So. 2d at 854 ("[T]he trial court must consider all mitigation anywhere in the record to the extent it is believable and uncontroverted even when a defendant waives the presentation of mitigating evidence." (citing Overton v. State, 801 So. 2d 877 (Fla. 2001))).

The record shows that the trial court cautioned Sparre about the risks involved with his decision to forbid defense counsel from putting on mitigation evidence. The trial court also cautioned Sparre that there were risks in declining to exercise his right to testify on his own behalf. The trial court informed Sparre that under the circumstances there could be insufficient evidence in the record for finding mitigation that potentially counterbalances any aggravating factors in support of the death penalty.

An argument can be made that Sparre's proffered mitigation evidence would have rebutted the PSI report's entry stating: "The defendant showed no obvious signs of impairment to this officer." However, Sparre has the burden to show that the trial court's judgment to forego calling mitigation witnesses after Sparre

waived introducing such evidence "is arbitrary, fanciful, or unreasonable." Ocha, 826 So. 2d at 963.

In light of the trial court's findings and the reasons it provided for how it judged the alleged mitigation, there is no showing that the trial court failed to follow established procedure or engaged in actions that were arbitrary, fanciful, or unreasonable with regard to its judgment that it was unnecessary to call any of the mitigation witnesses proffered by Sparre's defense team.[11] Russ, 73 So. 3d at 190 ("Further, we have stated that '[p]roffered evidence is merely a representation of what evidence the defendant proposes to present and is not actual evidence.'. . .

_____

11. The trial court performed the requirements set forth in Koon to assess Sparre's waiver of presenting mitigation evidence: (1) Sparre testified under oath that he consulted with his lawyers about his decision to refuse putting on mitigation evidence; (2) the court informed Sparre that it would instruct the jury about aggravating and mitigating circumstances; (3) the court informed Sparre about the statutory basis for aggravation and the rationale on whether it would be applied in his case; (4) the court also informed Sparre about statutory mitigation, and the risks of not having it applied if the experts did not testify; (5) the court also informed Sparre about the risks of not having testimonial evidence in support of nonstatutory mitigators; (6) after this exchange with the court, Sparre personally informed the court that he fully understood everything that it explained and declined the court's invitation to ask questions; (7) defense counsel stated for the record that it did not believe that Sparre lacked competence to make the decision to refuse to put on a mitigation case; (9) at the prompting of the State, the court asked Sparre whether he was under the influence of any medication—to which Sparre responded that he had been prescribed Thorazine and Celexa, but he stopped taking them because they gave him "the shakes"; and (10) the court commented on the record that Sparre appeared to be lucid and confirmed with counsel that there was an absence of competency with respect to Sparre's involvement with all aspects of the trial.

Therefore, the trial court did not err in failing to consider the proffered mitigation evidence that was presented during the <u>Koon</u> hearing.").

The trial court's detailed sentencing order provides sufficient evidentiary bases that would discourage a reasonable person from rejecting its judgment. <u>Id.</u> Furthermore, there is insufficient evidence in the record showing a probability of substantial mitigation that the trial court should have further considered by calling its own witnesses in accordance with the governing standard. <u>See</u> <u>Muhammad</u>, 782 So. 2d at 364; <u>Russ</u>, 73 So. 3d at 191 ("Here, the PSI report did not alert the court to the probability of significant mental mitigation.").

The trial court's order reflects that under the totality of circumstances surrounding Sparre's case, it judged that the trial evidence and the PSI report provide sufficient grounds for the mitigation found and the weights it assigned to each factor. We agree and conclude that Sparre simply fails to establish by competent, substantial evidence in the record how the trial court abused its discretion in declining to call its own mitigation witnesses.

### 3. Harmless Error

Even if it can be later shown that the trial court's declination to call its own mitigation witnesses or appoint special counsel to put on a mitigation case under the circumstances was an abuse of discretion, such judgment by the trial court was

not reversible error.  In light of the two very weighty aggravators: HAC[12] and murder committed during the course of a burglary,[13] any error that occurred by the trial court's abuse of discretion concerning this issue is harmless beyond a reasonable doubt.  See generally Orme v. State, 25 So. 3d 536, 548 (Fla. 2009) ("We find that although the trial court's treatment of this mitigator was improper, the error was harmless given the severity of the three aggravators in the case and other relatively weak mitigation."); Doorbal v. State, 837 So. 2d 940, 959 (Fla. 2003) (determining "that even if any error occurred in not admitting the letters [during the penalty phase], which it did not, such error was harmless").

Based on the aggravating factors that the trial court found and assigned great weight, and notwithstanding any weight assigned to the proffered mitigating factors, there was no reasonable probability the finding of such mitigating factors would have changed the jury's death penalty recommendation or the trial court's judgment to impose the sentence of death.  See Smith v. State, 28 So. 3d 838, 867 (Fla. 2009) ("The trial court expressly stated that any one of the aggravators found (except felony probation) was sufficient to outweigh the mitigating factors due to the totality of the aggravating factors that we uphold and affirm today.  There is no possibility that any erroneous finding on this issue affected the sentence

---

12.  See § 921.141(5)(h), Fla. Stat. (2010).

13.  See § 921.141(5)(d), Fla. Stat. (2010)

imposed."). Under the circumstances found in this case, if the trial court's exercise of discretion in declining to call its own mitigation witnesses regarding these statutory mitigating factors could be deemed an abuse of discretion, such a judgment constituted harmless error.

We note that the trial court found that no evidence was introduced for the nonstatutory mitigating circumstance "the Defendant's judgment was impaired." However, in a portion of the redacted video-recording of Sparre's interview with detectives on July 24 that was replayed for the jury, Sparre made a statement that could be deemed evidence of his impaired judgment. The jury heard the detectives ask why he killed Pool, and Sparre's response. The record reflects that Sparre responded by stating that when he went into the kitchen he retrieved the large knife and returned to the bedroom where Pool was lying supine and nude across her bed. Sparre states that he began massaging her at first, but then he started stabbing her and described his experience during the attack as "tripping out." Sparre did not, however, explain what he meant by his self-assessment that he was "tripping out."

The record shows that when the detectives asked him about whether he had taken any drugs prior to committing the crime, Sparre denied that he was under the influence of any drugs during his fatal attack of Pool. Sparre's "tripping out" expression could be viewed as constituting some evidence that "he was not in a state of mind where he could make clear and rational decisions."

On the other hand, the ambiguous meaning of "tripping out" is not in itself competent, substantial evidence that warrants a finding of the nonstatutory mitigating factor. In light of this aspect of the video-recording evidence from Sparre's interview with detectives, if the trial court erred by ruling there was no evidence presented in support of the defendant's impaired judgment nonstatutory mitigating factor, its error was in not exploring what Sparre meant by his assertion that he began "tripping out" during his attack on Pool.

Even if the trial court should have found evidence that Sparre's "judgment was impaired," a failure to find this nonstatutory mitigating factor would constitute harmless error in light of the overwhelming weight of evidence that he was guilty of committing first-degree murder and the findings of very serious aggravating circumstances. See Hojan v. State, 3 So. 3d 1204, 1210 (Fla. 2009) ("The test for harmless error is set out in State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986). Under DiGuilio, '[t]he question [for harmless error analysis] is whether there is a reasonable possibility that the error affected the verdict.' Id. at 1139."). Accordingly, we reject this claim and deny Sparre any relief thereto.

### B. Invitation to Recede from Hamblen

Next, Sparre urges us to recede from our holding in Hamblen, 527 So. 2d at 800. Sparre specifically argues that the following excerpt from Hamblen is problematic:

- 30 -

We find no error in the trial judge's handling of this case. Hamblen had a constitutional right to represent himself, and he was clearly competent to do so. To permit counsel to take a position contrary to his wishes through the vehicle of guardian ad litem would violate the dictates of Faretta. In the field of criminal law, there is no doubt that "death is different," but, in the final analysis, all competent defendants have a right to control their own destinies. This does not mean that courts of this state can administer the death penalty by default. The rights, responsibilities and procedures set forth in our constitution and statutes have not been suspended simply because the accused invites the possibility of a death sentence. A defendant cannot be executed unless his guilt and the propriety of his sentence have been established according to law.

Id. at 804.

According to Sparre, Hamblen and its progeny are based on two faulty premises. First, the appointment of special counsel would interfere with a defendant's right to self-representation. Second, a case-by-case approach ensures that the death penalty is imposed fairly, reliably, and uniformly.

We find that Sparre has not provided a good-faith basis for suggesting that we recede from controlling precedent comparable to that which we established in Haag v. State, 591 So. 2d 614 (Fla. 1992). In Haag, Justice Kogan writing for a unanimous Court stated:

We recognize that our opinion today recedes from and overrules earlier precedent in this jurisdiction. The opinions of the district courts in Lindsay v. State, 579 So. 2d 350 (Fla. 1st DCA 1991), Ruggirello v. State, 566 So. 2d 30 (Fla. 4th DCA), review dismissed, 569 So. 2d 1280 (Fla. 1990), Clifford v. State, 513 So. 2d 772 (Fla. 2d DCA 1987), and Tucker v. Wainwright, 235 So. 2d 38 (Fla. 2d DCA 1970), contain results or analyses inconsistent with our views and accordingly are disapproved to the extent that they conflict

- 31 -

with this opinion. We also are receding from <u>Walker v. Wainwright</u>, 303 So. 2d 321 (Fla. 1974), and <u>State ex rel. Ervin v. Smith</u>, 160 So. 2d 518 (Fla. 1964), to the extent they conflict with the views expressed above.

While the doctrine of stare decisis normally would require a greater deference to this prior precedent, we find that the demands of justice and the principles of constitutional law recited above require an alteration in the precedent. As is self-evident, even the common law must bend before the dictates of the Florida Constitution. Not even the hoariest precedent is permitted to violate the guarantees of habeas relief, equal protection, and equal access to the courts, or any of the other fundamental rights set forth in the Declaration of Rights. Art. I, Fla. Const.

. . . .

It is a rule that precedent must be followed <u>except</u> when departure is necessary to vindicate other principles of law or to remedy continued injustice. <u>McGregor v. Provident Trust Co.</u>, 119 Fla. 718, 162 So. 323 (1935). We find that the guarantees embodied in Florida's Declaration of Rights are best vindicated by overruling the contrary precedent noted above.

<u>Id.</u> at 617-18.

Therefore, we reject Sparre's suggestion and explain why we decline to recede from <u>Hamblen</u>. First, Sparre's case-specific and self-serving arguments do not rise to the level of showing that "the demands of justice and the principles of constitutional law recited above require an alteration in the precedent" due to a recurring problem pertaining to this issue. <u>Haag</u>, 591 So. 2d at 618. Next, Sparre fails to point our attention to any specific way that <u>Hamblen</u> and its progeny, e.g., <u>Muhammad</u>, foster patent injustices, or otherwise stand contrary to constitutional imperatives in Florida's death penalty cases. Next, we find that the State raises a legitimate concern that the rule change that Sparre advocates could foreseeably

- 32 -

result in violations of the United States Supreme Court's longstanding holding in Faretta.[14] Under Faretta, competent capital defendants have the right to decide the courses of their own defense.

We find no compelling reason to alter the Hamblen policy. This policy subjects a trial court's judgment about whether to call its own mitigation witnesses or appoint special mitigation counsel to an abuse of discretion standard on review. And, the present abuse of discretion review framework provides an adequate safeguard for capital defendants' constitutionally protected rights. Accordingly, we reject Sparre's second claim as lacking merit and deny him any relief concerning this issue.

### C. Ring Claim

In Ring v. Arizona, 536 U.S. 584, 609 (2002), the Supreme Court "overrule[d] [Walton v. Arizona, 497 U.S. 639 (1990)] to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." We have repeatedly stated that the rule established by Ring does not apply under Florida's death penalty law. See, e.g., Martin v. State, 107 So. 3d 281, 322 (Fla. 2012), cert. denied, 133 S. Ct. 2832 (U.S. 2013) ("This Court has repeatedly held that Florida's capital sentencing scheme does not violate the United States Constitution under Ring." (citing Abdool

14. Faretta v. California, 422 U.S. 806 (1975).

- 33 -

v. State, 53 So. 3d 208, 228 (Fla. 2010))). Accordingly, we reject Sparre's claim, because Ring is not applicable under Florida law.

Even if Ring applied under Florida law, Sparre's claim is without merit for the following reasons. First, the penalty phase jury in considering the evidence presented found that the aggravating circumstances, HAC and the murder was committed during an armed burglary, were proven beyond a reasonable doubt. See Duest v. State, 855 So. 2d 33, 49 (Fla. 2003) (citing Lugo v. State, 845 So. 2d 74, 119 n.79 (Fla. 2003); Doorbal, 837 So. 2d at 963. Second, the jury unanimously voted to recommend that Sparre be sentenced to death. Therefore, it is axiomatic that the jury unanimously found that one or both aggravating factors should apply toward its recommendation for the death penalty. Accordingly, the trial court did not violate Ring in sentencing Sparre to death.

## D. Sufficiency of the Evidence

"[T]his Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed." Martin, 107 So. 3d at 325 (citing Blake v. State, 972 So. 2d 839, 850 (Fla. 2007)). "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime

beyond a reasonable doubt." Id. (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

There is competent, substantial evidence in the record for the jury to convict Sparre of premeditated first-degree murder and first-degree murder during the course of an armed burglary. Under Florida law, premeditation prior to the act of murder is understood as requiring proof that the defendant was aware of the consequences of the actions that caused death, and that the defendant had the opportunity for reflection prior to committing the fatal act. Patrick v. State, 104 So. 3d 1046, 1063 (Fla. 2012) ("Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a moment before the act but must also exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." (quoting Bigham v. State, 995 So. 2d 207, 212 (Fla. 2008))), cert. denied, 134 S. Ct. 85 (2013); Johnson v. State, 969 So. 2d 938, 951 (Fla. 2007) (citing Sochor v. State, 619 So. 2d 285, 288 (Fla. 1993)).

The evidence in this record shows that Sparre made a conscious decision to walk from the victim's bedroom to retrieve a large kitchen knife as his weapon of choice to carry out a sustained knife attack on his defenseless victim after walking back from the kitchen to the bedroom where she was lying down. Testimony from the medical examiner confirmed Sparre's statement that it took Pool several

minutes to die from her wounds; she fought for her life and sustained at least eighty-eight sharp-force injuries, including thirty-nine defensive wounds, before succumbing to death. In the opinion of the medical examiner, the fatal wounds inflicted by Sparre came near the end of his attack on Pool. It is evident that Sparre had time even after he began his vicious attack on Pool to stop himself before he inflicted any of the mortal wounds. See Patrick, 104 So. 3d at 1063 ("The record here demonstrates sufficient evidence for the jury to have inferred that Patrick did intend for [the victim] to die.").

The commission of the murder during an armed burglary was established when Sparre's invitation into Pool's residence was effectively rescinded. See Bradley v. State, 33 So. 3d 664, 681 (Fla. 2010) ("Shortly after the decision in [Delgado v. State, 776 So. 2d 233 (Fla. 2000)], the Florida Legislature enacted legislation abrogating that decision, and clarifying that 'for a burglary to occur, it is not necessary for the licensed or invited person to remain in the dwelling, structure or conveyance surreptitiously.' ") (footnote omitted).

In other words, Sparre was no longer an invitee at the point in time he began his fatal attack on Pool, and she began futilely attempting to defend herself. In addition, Sparre exhibited his intent to commit burglary when he remained in Pool's residence and committed a forcible felony against her (murder).

The trial court instructed the jury on the requirements under Florida law for all applicable offenses, including premeditated murder and felony murder with the underlying felony of burglary. And, the jury returned a special guilty verdict for "the killing was done during the commission of a felony, to wit: Burglary." We have previously held that such verdicts as the one the jury returned for Sparre are permissible under Florida law. See Crain v. State, 894 So. 2d 59, 69 (Fla. 2004) ("[I]t is well settled that if an indictment charges premeditated murder, the State need not charge felony murder or the particular underlying felony to receive a felony murder instruction. . . . As long as the definition of the underlying felony provided to the jury is sufficiently definite to assure the defendant a fair trial, '[i]t is not necessary . . . to instruct on the elements of the underlying felony with the same particularity as would be required if the defendant were charged with the underlying felony.' ") (citations omitted). Accordingly, there is sufficient evidence in this record to support the jury's guilty verdict of first-degree murder under both theories presented by the State in its capital murder case against Sparre.

### E. Proportionality

Our "proportionality review focuses on the totality of the circumstances in one case and compares it with other similar capital cases to ensure uniformity in application." Francis v. State, 808 So. 2d 110, 141 (Fla. 2001) (citing Urbin v. State, 714 So. 2d 411, 416-17 (Fla. 1998)); see also Russ, 73 So. 3d at 198 ("[T]his

- 37 -

Court must conduct a qualitative analysis and comparison of other capital cases to determine whether the death sentence is proportionate."); Barnes v. State, 29 So. 3d 1010, 1028 (Fla. 2010) ("The death penalty is 'reserved only for those cases where the most aggravating and least mitigating circumstances exist.' " (quoting Terry v. State, 668 So. 2d 954, 965 (Fla. 1996))). We have previously concluded that the HAC aggravating factor is one of the most serious established under the Florida Statutes. Aguirre-Jarquin v. State, 9 So. 3d 593, 610 (Fla. 2009).

In Sparre's case, the trial court assigned great weight to the two aggravating factors found. The only statutory mitigating factor—Sparre was nineteen years old—was assigned moderate weight. And, the thirteen nonstatutory mitigating factors were respectively assigned some, little, and slight weights. All of the trial court's findings in aggravation and mitigation were based on competent, substantial evidence in this record.

We have previously affirmed the death penalty in cases where two weighty aggravating factors—HAC and murder during the commission of a felony (burglary)—were proven, and these aggravating factors outweighed the mitigating factors found. See Woodel v. State, 985 So. 2d 524, 533 (Fla. 2008) (finding Woodel's sentence of death proportionate for the stabbing death of an elderly couple for which the trial court found four aggravators—HAC, murder occurred during the commission of a burglary, previously convicted of another capital

- 38 -

felony, and advanced age of the victims made them particularly vulnerable—and four statutory mitigators—no significant criminal history; defendant's age; substantial impairment of capacity to appreciate actions or conform conduct to the requirements of law; and extreme emotional disturbance—and ten nonstatutory mitigators); Merck v. State, 975 So. 2d 1054, 1066 (Fla. 2007) (finding Merck's death sentence to be proportionate in light of the trial court's finding of two aggravating factors, conviction of a prior violent felony and HAC; one statutory mitigating factor, defendant's age of nineteen at the time of the murder; and several nonstatutory mitigating factors); Schoenwetter v. State, 931 So. 2d 857, 874-76 (Fla. 2006) (finding Schoenwetter's death sentences were proportionate when the victims were repeatedly and fatally stabbed, which supported the HAC finding; the trial court also found elimination of witness/avoid arrest as an aggravating factor; and considered statutory mitigators—defendant's age, lack of prior criminal history, impaired capacity, and extreme emotional disturbance—and nonstatutory mitigating factors); Geralds v. State, 674 So. 2d 96, 104 (Fla. 1996) (finding Geralds' death sentence was proportionate after vacating the CCP aggravating factor because "two substantial aggravators [remained], including the heinous, atrocious, [or] cruel aggravator, and mitigation that the trial judge gave 'little weight.' ").

In light of existing case law, Sparre's sentence is proportionate to other cases in which this Court has considered similar facts and aggravating and mitigating circumstances, and affirmed the death penalty imposed on those defendants. See, e.g., Geralds, 674 So. 2d at 104.

## VIII. CONCLUSION

For the foregoing reasons, we affirm Sparre's conviction for first-degree murder and the sentence of death imposed upon him.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
PARIENTE, J., concurs in part and dissents in part, with an opinion.
CANADY, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring in part and dissenting in part.

I concur in affirming Sparre's conviction for first-degree murder. I dissent, however, from the affirmance of his sentence of death. In my view, the trial court erred by failing to call mitigation witnesses and by then rejecting the proposed mitigating factors that the testimony of these witnesses may have established, particularly where defense counsel stated that they could present potentially significant and compelling mitigating evidence regarding Sparre's mental health and dysfunctional personal history.

- 40 -

I write to explain why this error cannot be considered harmless beyond a reasonable doubt and also to urge that this Court adopt specific guidelines for when trial courts should either appoint special counsel or call mitigation witnesses in any case where the defendant validly waives the presentation of mitigating evidence. While I agree with this Court's continued emphasis on ensuring that all available mitigation is considered by the trial court, see Marquardt v. State, No. SC12-555, slip op. at 48-49 (Fla. Jan. 22, 2015), I would go one step further and require the appointment of special counsel in every case where the defendant waives mitigation.

## I.

## A.

In this case, Sparre was only nineteen years old at the time of the crime and had a history of mental illness and physical and emotional abuse. Four mental health experts were prepared to testify as to the nature of his illness and that he had diagnoses of Attention Deficit Hyperactivity Disorder (ADHD), Posttraumatic Stress Disorder (PTSD), substance abuse, Intermittent Explosive Disorder, and Bipolar Schizoaffective Disorder—and that his PTSD dated back to his childhood when he was in a boys' school in South Carolina. Defense counsel also informed the trial court that they were prepared to present testimony that Sparre's continued

- 41 -

use of drugs, such as hydrocodone and cocaine, could cause blackouts and memory loss, and that he had a dysfunctional family and personal history.

Despite being informed about all of this potentially significant mitigating evidence, including mental health mitigation, the trial court failed to take any action, other than to order a comprehensive presentence investigation report (PSI) as required by Muhammad v. State, 782 So. 2d 343, 363-64 (Fla. 2001). The trial court did not hear from witnesses that could have testified as to what may have prompted Sparre's PTSD during childhood, nor did the trial court ascertain any other potentially compelling mitigation concerning Sparre's mental health and the mitigating circumstances that may apply—even though the trial court was specifically alerted to the existence of this potentially significant evidence. Thus, aside from what can be gleaned from the PSI, the record is devoid of any evidence in mitigation for this young offender since none of the mitigation that clearly exists was ever presented.

Although this Court has left it to the discretion of the trial courts to determine whether to call mitigation witnesses or appoint special counsel to present mitigating evidence in cases where the defendant waives mitigation, see id. at 364, a trial court's discretion is not without limits. In particular, trial courts still have an obligation to consider and weigh all possible mitigation in the record and to call witnesses when the PSI "alerts the court to the existence of significant

mitigation." Russ v. State, 73 So. 3d 178, 189 (Fla. 2011). By improperly limiting its consideration of the mitigating evidence to only what was contained in the PSI, even though the trial court was alerted to "the existence of significant mitigation" in this case, I would conclude that the trial court abused its discretion, which must be exercised in a way that enables the trial court and this Court to accurately and reliably determine whether a death sentence is warranted under Florida law.

The sole reason offered by the trial court in its written sentencing order for not exercising its important discretion to call mitigation witnesses, or to appoint special counsel to do so, based on the mitigation that defense counsel informed the trial court that they could present, was that Sparre did not want any witnesses to be called. This was error since the trial court is required by Florida's capital sentencing statute to ensure that the defendant is truly deserving of the death penalty, which is not solely dependent on a defendant's own wishes to be sentenced to death. See § 921.141(3), Fla. Stat. (2012) (requiring a trial court to weigh the aggravating and mitigating circumstances and, if imposing a sentence of death, to state that there are insufficient mitigating circumstances to outweigh the aggravating circumstances). In fact, not only did the trial court fail to call witnesses or appoint special counsel even after being alerted to the existence of this significant mitigation, but the trial court then compounded this error by rejecting defense counsel's proposed mitigating circumstances that testimony from these

witnesses may have established, stating that it "was not required to accept" those mitigators as proven based on the information defense counsel brought to the trial court's attention.

Because the trial court failed to even explore the proposed mitigators based on evidence that could have been presented, this Court is likewise unable to adequately fulfill our constitutional and statutory responsibilities to determine whether this case constitutes one of the most aggravated <u>and least mitigated</u> of all murders, for which the death penalty is properly imposed. <u>See</u> <u>State v. Dixon</u>, 283 So. 2d 1, 7 (Fla. 1973). This is of particular concern because "it is not necessarily those most deserving of the death penalty (e.g., the most aggravated and least mitigated) who seek its imposition and refuse to present mitigation." <u>Muhammad</u>, 782 So. 2d at 369 (Pariente, J., specially concurring).

**B.**

This Court's attempt on appeal to perform a harmless error analysis reveals the inherent problems created by the trial court's error. <u>See</u> majority op. at 27-30. Simply put, because none of the potentially significant mitigation was ever presented, there is no basis in the record for the majority to conclude beyond a reasonable doubt that the defendant was not prejudiced—that is, that there is no reasonable possibility that the jury or trial judge would have been affected by potentially compelling mitigation evidence to which they were never exposed.

This Court's decision in <u>Klokoc v. State</u>, 589 So. 2d 219 (Fla. 1991), perfectly illustrates why the trial court's error cannot be considered harmless. Klokoc, who wished to be executed, waived the presentation of mitigating evidence, but the trial court appointed special counsel, who offered testimony concerning, among other things, Klokoc's mental illness. <u>Id.</u> at 220. On direct appeal, this Court vacated the death sentence, concluding—based in large part on the evidence obtained and introduced by special counsel—that the murder occurred while Klokoc "was under extreme emotional distress" and that he suffered "from bipolar affective disorder, manic type with paranoid features, and that his family has a history of suicide, emotional disturbance, and alcoholism." <u>Id.</u> at 222.

Similarly, in this case, we are confronted with a young offender who has a potentially compelling mental health and dysfunctional family background, including a diagnosis of PTSD dating to childhood and a physically and emotionally abusive upbringing. Just as in <u>Klokoc</u> and our subsequent cases, this Court is required to consider whether this is truly a case deserving of the death penalty or whether the death penalty is not warranted, given both the nature of the crime and this young man's history. <u>See</u> <u>Farr v. State</u>, 621 So. 2d 1368, 1369 (Fla. 1993) (explaining that the requirement that all mitigation be considered and weighed "applies with no less force when a defendant argues in favor of the death

- 45 -

penalty, and even if the defendant asks the court not to consider mitigating evidence").

Yet, in the absence of any witness testimony or evidence introduced by special counsel, as was done in <u>Klokoc</u>, we are unable to consider the impact of Sparre's mental illness on the commission of this crime, which hinders our responsibility to ensure that the death penalty is reliably and uniformly imposed in all cases. Accordingly, a new penalty-phase proceeding is required.

## II.

In my view, this case also represents another important reminder that the time has come to prospectively require the appointment of special counsel in any case in which the defendant waives mitigation, "in order to better assist the trial court and this Court in fulfilling its constitutional and statutory obligations in death penalty cases." <u>Muhammad</u>, 782 So. 2d at 368 (Pariente, J., specially concurring). As then-Chief Justice Barkett opined over twenty years ago, the appointment of special counsel is critical in order for this Court "to ensure a reliable and proportionate sentence." <u>Koon v. Dugger</u>, 619 So. 2d 246, 251 (Fla. 1993) (Barkett, C.J., specially concurring). "It should be the <u>state's</u> independent and informed decision that imposes death and not the decision of a defendant who <u>uses</u> the state as an instrument for suicide." <u>Farr</u>, 621 So. 2d at 1371 (Barkett, C.J., specially concurring).

This case demonstrates why it is critical that we "have a uniform procedure to be followed in all cases where the defendant waives mitigation so that available mitigating evidence is placed in the record at the time of the original sentencing proceedings." Muhammad, 782 So. 2d at 368 (Pariente, J., specially concurring). Since Muhammad, where this Court authorized trial courts in their discretion to appoint special counsel, we have unfortunately continued to encounter some cases where special counsel has been appointed and others where trial courts have chosen not to do so, and this Court has still offered no definitive guidelines as to when the appointment of special counsel is appropriate. Compare Russ, 73 So. 3d 178 (appointing special counsel), with Ocha v. State, 826 So. 2d 956 (Fla. 2002) (not appointing special counsel).

Joined by Justices Shaw and Anstead in Muhammad, I stated as follows in asserting why appointment of special counsel should be required in all cases where the defendant waives mitigation, which remains as true today as it did over thirteen years ago:

> Because of the tremendous responsibilities placed on the trial court and this Court in death penalty cases, rather than leave the appointment of counsel to the trial court's discretion on a case-by-case basis, I would thus adopt a prospective rule that would provide for the appointment of special counsel to present available mitigation for the benefit of the jury, the trial court and this Court in order to assist the judiciary in performing our statutory and constitutional obligations. This procedure, of course, would not prevent the defendant himself or herself from arguing in favor of the death penalty.

- 47 -

Adoption of this procedure would serve to promote several important interests critical to the integrity of the process: (1) it would assist any advisory jury in making a more informed sentencing recommendation of either death or life and in fulfilling its statutory obligation to weigh mitigating and aggravating circumstances under section 924.141(2)(b); (2) it would assist the trial court in making a more informed decision as to whether to impose the death sentence by ensuring that the court has before it the available mitigating evidence; and (3) it would facilitate this Court's constitutionally mandated obligation to review each death sentence for proportionality.

I also believe that adoption of this procedure would serve the important additional goal of promoting finality when a sentence of death is imposed.

Muhammad, 782 So. 2d at 370-71 (Pariente, J., specially concurring) (emphasis added). As further explained, "not only would a procedure providing for appointment of special counsel promote the fair and efficient administration of justice, but it would do so without requiring significant additional resources." Id. at 371.

If a majority of this Court does not agree to prospectively require the appointment of special counsel in all cases where the defendant waives mitigation, trial courts should at least be provided guidance as to how to exercise their discretion, which is not boundless, in these difficult cases. In particular, I would advise trial courts that, when they are made aware of the probability of significant mental health mitigation—as here—special counsel should be appointed, or alternatively, one or more of the mental health experts should be called to testify. This would be an additional step to further this Court's important task to ensure

reliability and uniformity of cases where the death penalty is imposed and would be consistent with this Court's own precedent regarding the basis for the trial court to call witnesses or appoint special counsel in the first place. See Muhammad, 782 So. 2d at 364 ("Further, if the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion to call persons with mitigating evidence as its own witnesses. . . . If the trial court prefers that counsel present mitigation rather than calling its own witnesses, the trial court possesses the discretion to appoint counsel to present the mitigation . . . ." (emphasis added)).

Finally, while it is true that no lawyer raised objections to the adequacy or comprehensiveness of the PSI in this case, without the appointment of special counsel, there was no attorney in a position to object to the PSI. The reality is that no matter how often we direct that the PSI must be "comprehensive," the very fact that the PSI is compiled by non-lawyers who are less familiar with the types of available and compelling mitigation that can be effectively presented makes the trial court's decision of whether to call additional witnesses a difficult one. Requiring the appointment of special counsel to evaluate the PSI and present witnesses would assist the trial court's ability to ensure that it has been fully informed about all mitigating evidence before determining whether to impose a

death sentence and would thus foster consistency and integrity in sentencing

proceedings.

An Appeal from the Circuit Court in and for Duval County,
Elizabeth Anne Senterfitt, Judge - Case No. 162010CF008424AXXXMA

Nancy Ann Daniels, Public Defender, and Nada Margaret Carey, Assistant Public Defender, Tallahassee, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Charmaine Millsaps, Assistant Attorney General, Tallahassee, Florida,

for Appellee